# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WESTERN STATES PAVING CO., INC.,
*Plaintiff-Appellant,*

v.

WASHINGTON STATE DEPARTMENT OF
TRANSPORTATION; CITY OF
VANCOUVER, WASHINGTON; CLARK
COUNTY, WASHINGTON; DOUGLAS
MACDONALD,
*Defendants-Appellees,*

UNITED STATES OF AMERICA; U.S.
DEPARTMENT OF TRANSPORTATION;
FEDERAL HIGHWAY ADMINISTRATION,
*Defendants-Intervenors-Appellees.*

No. 03-35783

D.C. No.
CV-00-05204-RBL

OPINION

Appeal from the United States District Court
for the Western District of Washington (Tacoma)
Ronald B. Leighton, District Judge, Presiding

Argued and Submitted
February 11, 2005—Seattle, Washington

Filed May 9, 2005

Before: Monroe G. McKay,* Diarmuid F. O'Scannlain, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge O'Scannlain;
Partial Concurrence and Partial Dissent by Judge McKay

*The Honorable Monroe G. McKay, Senior United States Circuit Judge
for the Tenth Circuit, sitting by designation.

5005

## COUNSEL

Gary E. Lofland, Lofland and Associates, Yakima, Washington, argued the cause for the appellant.

Lisa J. Stark, United States Department of Justice, Washington, D.C., argued the cause for appellees United States of America, U.S. Department of Transportation, and Federal Highway Administration; R. Alexander Acosta, Assistant Attorney General, Mark L. Gross, United States Department of Justice, Washington, D.C., and Jeffrey A. Rosen, Paul M. Geier, and Edward V.A. Kussy, United States Department of Transportation, Washington, D.C., were on the brief.

Steve E. Dietrich, Assistant Attorney General, Olympia, Washington, argued the cause for appellee Washington State

Department of Transportation; Christine O. Gregoire, Attorney General, Olympia, Washington, was on the brief.

E. Bronson Potter, Senior Deputy Prosecuting Attorney, Vancouver, Washington, argued the cause for appellee Clark County.

Alison J. Chinn, Assistant City Attorney, Vancouver, Washington, was on the brief for appellee City of Vancouver.

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide whether the Transportation Equity Act for the 21st Century, which authorizes the use of race- and sex-based preferences in federally funded transportation contracts, violates equal protection, either on its face or as applied by the State of Washington.

I

Western States Paving Co. ("Western States") is an asphalt and paving contractor based in Vancouver, Washington. The company is owned by a white male. In July 2000, Western States submitted a bid for subcontracting work on the City of Vancouver's "NE Burton Road Project." The project was financed by federal transportation funds provided to the Washington State Department of Transportation ("WSDOT") under the Transportation Equity Act for the 21st Century ("TEA-21"). In order to comply with TEA-21's minority utilization requirements, the State mandated that the city obtain 14% minority participation on the project.[1] The prime con-

---

[1] Because TEA-21 does not draw any material distinctions between racial minorities and women, the term "minority" will be used to encompass both groups.

tractor was bound by this requirement and rejected Western States' bid in favor of a higher bid from a minority-owned firm.

In August 2000, Western States submitted a subcontracting bid on Clark County's "Padden Parkway (East Leg)" project, which was substantially financed with TEA-21 funds. In distributing these funds to Clark County, the WSDOT imposed a 14% minority utilization requirement. The prime contractor did not select Western States, even though its bid was $100,000 less than that of the minority-owned firm that was selected. The prime contractor explicitly identified the contract's minority utilization requirement as the reason that it rejected Western States' bid.

Western States filed suit against the WSDOT, Clark County, and the City of Vancouver in the United States District Court for the Western District of Washington. Western States sought a declaratory judgment holding TEA-21's minority preference program to be a violation of equal protection under the Fifth and Fourteenth Amendments of the U.S. Constitution, either on its face or as applied by the State of Washington. Western States also requested damages under 42 U.S.C. §§ 1981, 1983, and 2000(d) and relief under Washington state law. The United States, the U.S. Department of Transportation ("USDOT"), and the Federal Highway Administration intervened to defend TEA-21's facial constitutionality. Although the federal government took no position regarding Western States' as-applied challenge, it acknowledged that the "state would have to have evidence of past or current effects of discrimination to use race-conscious goals." Dist. Ct. Oral Argument Tr. 48.

The district court held that TEA-21's minority preference program is constitutional both on its face and as applied, and granted the defendants summary judgment on that basis. In rejecting the facial challenge, the district court determined that Congress had identified significant evidence of discrimi-

nation in the transportation contracting industry and that TEA-21 is narrowly tailored to remedy such discrimination. The district court rejected Western States' as-applied challenge because it concluded that Washington's implementation of TEA-21 comports with the federal program's requirements. The court did not require Washington to demonstrate that its minority preference program independently satisfies strict scrutiny. The district court also held that Western States' claims under Washington law are without merit. Western States timely appealed.[2]

## II

TEA-21 was enacted by Congress in 1998 and is the most recent in a series of federal transportation statutes providing for race- and sex-based contracting preferences.[3] Pub. L. No. 105-178, 112 Stat. 107 (1998). TEA-21 was initially scheduled to expire on September 30, 2003, but—pending permanent reauthorization—it has been temporarily renewed several times and is now due to lapse on May 31, 2005. Surface Transportation Extension Act of 2004, Part V, Pub. L. No. 108-310, 118 Stat. 1144.

The pertinent provision of TEA-21 provides that, "[e]xcept to the extent that the Secretary [of Transportation] determines otherwise, not less than 10 percent of the amounts made available for any program under titles I, III, and V of this Act shall be expended with small business concerns owned and con-

---

[2]Because Western States did not renew its state law arguments on appeal, those issues are waived. *See Alaska Ctr. for the Env't v. United States Forest Serv.*, 189 F.3d 851, 858 n.4 (9th Cir. 1999) ("Arguments not raised in [an] opening brief are waived.").

[3]TEA-21 replaced the Intermodal Surface Transportation Efficiency Act of 1991 ("ISTEA"), Pub. L. No. 102-240, § 1003(b), 105 Stat. 1914, 1919-21. ISTEA was preceded by the Surface Transportation and Uniform Relocation Assistance Act of 1987, Pub. L. No. 100-17, § 106(c), 101 Stat. 132, 145, and the Surface Transportation Assistance Act of 1982, Pub. L. No. 97-424, § 105(f), 96 Stat. 2097, 2100.

trolled by socially and economically disadvantaged individuals." § 1101(b)(1), 112 Stat. at 113. The specifics of this minority preference program are set forth in regulations promulgated by the USDOT. *See* 49 C.F.R. pt. 26 (1999).

The regulations seek "[t]o create a level playing field on which [disadvantaged business enterprises] can compete fairly for DOT-assisted contracts." *Id.* § 26.1(b). A disadvantaged business enterprise ("DBE") is defined as a small business owned and controlled by one or more individuals who are socially and economically disadvantaged. *Id.* § 26.5. Although the term "socially and economically disadvantaged" is race- and sex-neutral on its face, the TEA-21 regulations presume that Black Americans, Hispanic Americans, Native Americans, Asian-Pacific Americans, Subcontinent Asian Americans, and women are socially and economically disadvantaged.[4] *Id.* § 26.67(a). This presumption of disadvantage is

---

[4]The regulations further delineate the numerous ethnic groups that are subsumed by each of these broad classifications:

(i)    "Black Americans" . . . includes persons having origins in any of the Black racial groups of Africa;

(ii)    "Hispanic Americans" . . . includes persons of Mexican, Puerto Rican, Cuban, Dominican, Central or South American, or other Spanish or Portuguese culture or origin, regardless of race;

(iii)    "Native Americans" . . . includes persons who are American Indians, Eskimos, Aleuts, or Native Hawaiians;

(iv)    "Asian-Pacific Americans" . . . includes persons whose origins are from Japan, China, Taiwan, Korea, Burma (Myanmar), Vietnam, Laos, Cambodia (Kampuchea), Thailand, Malaysia, Indonesia, the Philippines, Brunei, Samoa, Guam, the U.S. Trust Territories of the Pacific Islands (Republic of Palau), the Commonwealth of the Northern Marianas Islands, Macao, Fiji, Tonga, Kirbati, Juvalu, Nauru, Federated States of Micronesia, or Hong Kong;

(v)    "Subcontinent Asian Americans" . . . includes persons whose origins are from India, Pakistan, Bangladesh, Bhutan, the Maldives Islands, Nepal or Sri Lanka . . . .

49 C.F.R. § 26.5.

rebutted where the individual has a personal net worth of more than $750,000 or a preponderance of the evidence demonstrates that the individual is not in fact socially and economically disadvantaged. *Id.* § 26.67(b). Firms owned and controlled by someone who is not presumed to be disadvantaged (i.e., a white male) can qualify for DBE status if the individual can demonstrate that he is in fact socially and economically disadvantaged. *Id.* § 26.67(d).

The regulations do not establish a nationwide DBE program centrally administered by the USDOT. Rather, the regulations delegate to each State that accepts federal transportation funds the responsibility for implementing a DBE program that comports with TEA-21. The regulations accordingly explain that the 10% DBE utilization requirement established by the TEA-21 statute is merely "aspirational" in nature. *Id.* § 26.41(b). The statutory goal "does not authorize or require recipients to set overall or contract goals at the 10 percent level, or any other particular level, or to take any special administrative steps if their goals are above or below 10 percent." *Id.* § 26.41(c).

The TEA-21 regulations instead delineate a two-step process that a State must follow to set a DBE utilization goal that reflects its "determination of the level of DBE participation [that] would [be] expect[ed] absent the effects of discrimination." *Id.* § 26.45(b). In establishing this goal, a State must first calculate the relative availability of DBEs in its local transportation contracting industry. *Id.* § 26.45(c). One acceptable means of making this determination is by dividing the number of ready, willing, and able DBEs in a State by the total number of ready, willing, and able firms. *Id.* § 26.45(c)(1). Under step two, a State is required to adjust this base figure upward or downward to reflect the proven capacity of DBEs to perform work (as measured by the volume of work allocated to DBEs in recent years) and evidence of discrimination against DBEs obtained from statistical disparity studies. *Id.* § 26.45(d)(1). A State may also consider discrimi-

nation against DBEs in the bonding and financing industries, as well as the present effects of past discrimination. *Id.* § 26.45(d)(2)-(3). The final, adjusted figure represents the proportion of federal transportation funding that a State must allocate to DBEs during the forthcoming fiscal year. *Id.* § 26.45(e)(1). A State must submit its DBE program to the USDOT for review by August 1 of each year. *Id.* § 26.45(f)(1).

The TEA-21 regulations expressly prohibit States from apportioning their DBE utilization goal among different minority groups (e.g., allocating 5% to Black Americans, 3% to Hispanic Americans, 0% to Asian Americans, etc.); rather, an undifferentiated goal that encompasses all minority groups is required. *Id.* § 26.45(h). A State must meet the maximum feasible portion of this goal through race-neutral means,[5] including informational and instructional programs targeted toward all small businesses. *Id.* § 26.51(a)-(b). A State must use race-conscious contract goals to achieve any portion of its DBE utilization requirement that cannot be attained through these race-neutral means. *Id.* § 26.51(d). Even when race-conscious measures are necessary, however, the regulations do not require that DBE utilization goals be included in every contract—or that they be set at the same level in every contract in which they are used—as long as the overall effect is to obtain that portion of the requisite DBE participation that cannot be achieved through race-neutral means. *Id.* § 26.51(e)(2).

Prime contractors to whom a State awards federally funded transportation contracts must undertake good faith efforts to satisfy a contract's DBE utilization goal by allocating the designated percentage of funds to DBE firms. *Id.* § 26.53(a). States are prohibited from instituting rigid quotas that do not

---

[5]The TEA-21 regulations use the term "race-neutral" to encompass "sex-neutral," and this convention will be followed here.

account for a prime contractor's good faith efforts to subcontract work to DBEs. *Id.* § 26.43(a).

III

**[1]** "[A]ll racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny. In other words, such classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests." *Adarand Constructors, Inc. v. Peña* ("*Adarand III*"), 515 U.S. 200, 227 (1995).[6] "The burden of justifying different treatment by ethnicity or sex is always on the government." *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 713 (9th Cir. 1997); *see also Johnson v. California*, 125 S. Ct. 1141, 1146 n.1 (2005) ("We put the burden on state actors to demonstrate that their race-based policies are justified."); *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003) ("To withstand our strict scrutiny analysis, [the University of Michigan] must demonstrate that [its] use of race in its current admission program employs narrowly tailored measures that further compelling governmental interests." (internal quotation marks omitted)). In addressing Western States' facial challenge, we must therefore determine whether the United States has met its burden of demonstrating that the federal statute and regulations satisfy strict scrutiny's exacting requirements. When considering the as-applied challenge, we must decide whether the State of Washington has met this same burden regarding its implementation of TEA-21's DBE program.

---

[6]Sex-based classifications must be both supported by an "exceedingly persuasive justification" and substantially related to the achievement of that underlying objective. *United States v. Virginia*, 518 U.S. 515, 524 (1996) (internal quotation marks omitted). The district court did not conduct a separate analysis of TEA-21's sex-based classifications under this standard. We likewise conclude that such an inquiry is unnecessary because, in this case, intermediate scrutiny would not yield a different result than that obtained under strict scrutiny's more stringent standard.

Two circuits have already considered TEA-21's constitutionality, and we will make frequent reference to these instructive decisions. In *Adarand Constructors, Inc. v. Slater* ("*Adarand VII*"), 228 F.3d 1147 (10th Cir. 2000), *cert. dismissed sub nom.*, *Adarand Constructors, Inc. v. Mineta*, 534 U.S. 103 (2001), the Tenth Circuit upheld TEA-21 on its face without considering whether it is constitutional as applied by any particular State. In *Sherbrooke Turf, Inc. v. Minnesota Department of Transportation*, 345 F.3d 964 (8th Cir. 2003), *cert. denied*, 124 S. Ct. 2158 (2004), the Eighth Circuit upheld TEA-21 on its face and as applied by the States of Minnesota and Nebraska.

## IV

We turn first to Western States' facial challenge. "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

## A

**[2]** The federal government has a compelling interest in ensuring that its funding is not distributed in a manner that perpetuates the effects of either public or private discrimination within the transportation contracting industry. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492 (1989) (plurality op. of O'Connor, J.) ("It is beyond dispute that any public entity, state or federal, has a compelling interest in assuring that public dollars, drawn from the tax contributions of all citizens, do not serve to finance the evil of private prejudice."); *Adarand VII*, 228 F.3d at 1176 ("The Constitution does not obligate Congress to stand idly by and continue to pour money into an industry so shaped by the effects of discrimination that the profits to be derived from congressional

appropriations accrue exclusively to the beneficiaries, however personally innocent, of the effects of racial prejudice.").

**[3]** Nevertheless, Congress may not merely intone the mantra of "discrimination" to satisfy the "searching examination" mandated by equal protection. *Adarand III*, 515 U.S. at 223 (internal quotation marks omitted); *see also Croson*, 488 U.S. at 500 ("[T]he mere recitation of a 'benign' or legitimate purpose for a racial classification is entitled to little or no weight."). Rather, we must evaluate the evidence that Congress considered in enacting TEA-21 to ensure that it had a "strong basis in evidence for its conclusion that remedial action was necessary." *Id.* (internal quotation marks omitted); *see also id.* at 493 (plurality op. of O'Connor, J.) ("Absent searching judicial inquiry into the justification for . . . race-based measures, there is simply no way of determining what classifications are 'benign' or 'remedial' and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics.").

Both statistical and anecdotal evidence of discrimination are relevant in identifying the existence of discrimination. *See Adarand VII*, 228 F.3d at 1166. Congress considered the following statistical evidence when debating TEA-21's enactment in 1998:

- Racial minorities constitute more than 20% percent of the United States population, but own only 9% of all businesses. 144 CONG. REC. H3945, H3958 (daily ed. May 22, 1998) (statement of Del. Norton).

- Firms owned by racial minorities have, on average, gross receipts that are approximately one-third those of firms owned by non-minorities. *Id.*

- Although racial minorities own 9% of all businesses, they receive only 4.1% of federal contracting dollars. *Id.*

- Women own nearly a third of all small businesses but receive less than 3% of federal contracting dollars. *Id.*

- White business owners in the construction industry receive more than 50 times as many loan dollars per dollar of equity capital as African-American owners with identical borrowing characteristics. *Id.*

- After the Supreme Court's 1989 *Croson* decision, many state and local governments removed affirmative action provisions from their public contracts. This prompted a significant drop in racial minorities' participation in the construction industry. In Richmond, Virginia, for example, minority participation in construction decreased from 40% of all contracts to less than 3% after the city's affirmative action program was discontinued. Similar results were seen in Philadelphia, Pennsylvania (97% decline), Tampa, Florida (99% decline for African-Americans and 50% for Hispanics), and San Jose, California (minority participation fell from 6% to 1% in prime construction contracts). *Id.*

Congress also explicitly relied upon a Department of Justice study—entitled *The Compelling Interest for Affirmative Action in Federal Procurement: A Preliminary Survey*—that documented the discriminatory hurdles that minorities must overcome to secure federally funded contracts. 61 Fed. Reg. 26,050 (May 23, 1996). The report found that discrimination by trade unions and financial lenders often precludes racial minorities from obtaining the experience and capital necessary to start businesses. *Id.* at 26,055 ("Discrimination by unions has been recognized as a major factor in preventing minorities from obtaining employment opportunities in the skilled trades."); *id.* at 26,058 (citing evidence that African-

Americans are three times more likely to be rejected for business loans than whites). The study also found that even when minorities are able to start a business, their success is often hampered by discrimination by prime contractors, business networks, suppliers, and bonding companies. *Id.* Such discrimination increases minority-owned firms' cost of doing business; these costs must then be passed along to customers, which results in minority-owned firms being less competitive than those owned by non-minorities. *See id.* at 26,059 ("institutional wall[s] and old-boy network[s] . . . make[ ] it exceedingly difficult for minority firms to break into the private commercial sector" (internal quotation marks omitted; alterations in original)).

Although Congress did not possess evidence that minorities suffer discrimination in every State's public contracting market, Congress need not undertake such an onerous task when enacting legislation that is applicable on a nationwide basis. *See Rothe Dev. Corp. v. United States Dep't of Def.*, 262 F.3d 1306, 1329 (Fed. Cir. 2001) ("Whereas municipalities must necessarily identify discrimination in the immediate locality to justify a race-based program, we do not think that Congress needs to have had evidence before it of discrimination in all fifty states . . . ."). Indeed, when the Eighth and Tenth Circuits considered TEA-21's constitutionality, both courts concluded that the legislative record amply demonstrated Congress's compelling interest in remedying the effects of discrimination within the transportation contracting industry. *See Sherbrooke Turf, Inc.*, 345 F.3d at 970 ("Congress has spent decades compiling evidence of race discrimination in government highway contracting, of barriers to the formation of minority-owned construction businesses, and of barriers to entry.").

The Tenth Circuit undertook an especially exhaustive inquiry into the evidence weighed by Congress and concluded that "both the race-based barriers to entry and the ongoing race-based impediments to success faced by minority subcontracting enterprises . . . are caused either by continuing dis-

crimination or the lingering effects of past discrimination on the relevant market." *Adarand VII*, 228 F.3d at 1175-76.

**[4]** In light of the substantial body of statistical and anecdotal material considered at the time of TEA-21's enactment, Congress had a strong basis in evidence for concluding that—in at least some parts of the country—discrimination within the transportation contracting industry hinders minorities' ability to compete for federally funded contracts.

B

**[5]** Once the government has demonstrated that it has a compelling basis for classifying individuals according to race, it must also establish that its use of race is narrowly tailored to further that interest. Indeed, "racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification." *Gratz*, 539 U.S. at 270 (internal quotation marks omitted). The Supreme Court has identified several factors that are relevant in determining whether a racial classification is narrowly tailored: "the efficacy of alternative remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market; and the impact of the relief on the rights of third parties." *United States v. Paradise*, 480 U.S. 149, 171 (1987).

1

Although "[n]arrow tailoring does not require exhaustion of every conceivable race-neutral alternative," it does "require serious, good faith consideration of workable race-neutral alternatives." *Grutter v. Bollinger*, 539 U.S. 306, 339 (2003); *see also Adarand III*, 515 U.S. at 237-38 (when undertaking narrow tailoring analysis, courts must inquire "whether there was any consideration of the use of race-neutral means to increase minority business participation in government contracting" (internal quotation marks omitted)).

The TEA-21 regulations place a preference on the use of race-neutral means—including informational and instructional programs targeted toward all small businesses—to achieve a State's DBE utilization goal. *See Sherbrooke Turf, Inc.*, 345 F.3d at 972 ("the regulations place strong emphasis on the use of race-neutral means" (internal quotation marks omitted)). Indeed, the regulations require a State to "meet the maximum feasible portion of [its] overall goal by using race-neutral means." 49 C.F.R. § 26.51(a). Only when race-neutral efforts prove inadequate do the regulations authorize a State to resort to race-conscious measures to achieve the remainder of its DBE utilization goal. As the Tenth Circuit recognized, "[w]e therefore are dealing here with [regulations] that emphasize the continuing need to employ non-race-conscious methods even as the need for race-conscious remedies is recognized." *Adarand VII*, 228 F.3d at 1179.

2

A quota system is the hallmark of an inflexible affirmative action program. While "[q]uotas impose a fixed number or percentage which must be attained, or which cannot be exceeded, . . . a permissible goal . . . requires only a good-faith effort . . . to come within a range demarcated by the goal itself." *Grutter*, 539 U.S. at 335 (internal quotation marks omitted; third and fourth alterations in original). In *Croson*, the Supreme Court invalidated a program that required prime contractors to whom the City of Richmond awarded construction projects to subcontract at least 30% of funds to minority-owned businesses. 488 U.S. at 477. The Court considered the program to be a "rigid racial quota" because waivers of the 30% goal were only permitted in "exceptional circumstances." *Id.* at 478-79, 499.

The TEA-21 regulations explicitly prohibit the use of quotas. 49 C.F.R. § 26.43(a). Moreover, where race-conscious contracting goals are used, prime contractors can meet that goal either by subcontracting the requisite amount of work to

DBEs or by demonstrating good faith efforts to do so. *Id.* § 26.53(a). A State likewise cannot be penalized by the federal government for failing to attain its DBE utilization goal as long as it undertakes good faith compliance efforts. *Id.* § 26.47(a). TEA-21 therefore provides for a flexible system of contracting goals that contrasts sharply with the rigid quotas invalidated in *Croson*. *See Sherbrooke Turf, Inc.*, 345 F.3d at 972 ("the [TEA-21] DBE program has substantial flexibility").

A narrowly tailored remedial program must also include adequate durational limitations. *See Grutter*, 539 U.S. at 341-42 (because a "core purpose of the Fourteenth Amendment was to do away with all governmentally imposed discrimination based on race . . . , race-conscious . . . policies must be limited in time"). TEA-21 comports with this requirement because it is subject to periodic reauthorization by Congress. The debates concerning reauthorization ensure that Congress regularly evaluates whether a compelling interest continues to justify TEA-21's minority preference program. *See Sherbrooke Turf, Inc.*, 345 F.3d at 972 ("Periodic legislative debate assure[s] all citizens that the deviation from the norm of equal treatment of all racial and ethnic groups is a temporary matter . . . ." (internal quotation marks omitted; first alteration in original)).

3

**[6]** To be narrowly tailored, a minority preference program must establish utilization goals that bear a close relationship to minority firms' availability in a particular market. In *Croson*, for example, one of the constitutional shortcomings that the Court identified in the Richmond program was the city's use of the proportion of minorities in the local population to establish the 30% quota. 488 U.S. at 507. The Court explained that this numerical goal "rest[ed] upon the completely unrealistic assumption that minorities will choose a particular trade

in lockstep proportion to their representation in the local population." *Id.* (internal quotation marks omitted).

The TEA-21 regulations avoid this pitfall. The regulations do not establish a mandatory nationwide standard for minority participation in transportation contracting. Indeed, the regulations clarify that the 10% DBE utilization goal found in the TEA-21 statute is "aspirational" only and that States are neither required—nor authorized—to set their own DBE goals at 10% by simply relying upon the statute. 49 C.F.R. § 26.41(b)-(c).

**[7]** The TEA-21 regulations instead provide for each State to establish a DBE utilization goal that is based upon the proportion of ready, willing, and able DBEs in the State's transportation contracting industry. *Id.* § 26.45(b). This provision ensures that each State sets a minority utilization goal that reflects the realities of its own labor market. *See Sherbrooke Turf, Inc.*, 345 F.3d at 972 ("DOT has tied the goals for DBE participation to the relevant labor markets.").

4

Implementation of the race-conscious contracting goals for which TEA-21 provides will inevitably result in bids submitted by non-DBE firms being rejected in favor of higher bids from DBEs. Although this places a very real burden on non-DBE firms, this fact alone does not invalidate TEA-21. If it did, all affirmative action programs would be unconstitutional because of the burden upon non-minorities. *Adarand III*, 515 U.S. at 237 (dispelling the notion that strict scrutiny is "strict in theory, but fatal in fact" (internal quotation marks omitted)); *see also Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 280-81 (1986) (plurality op. of Powell, J.) ("When effectuating a limited and properly tailored remedy to cure the effects of prior discrimination, such a sharing of the burden by innocent parties is not impermissible." (internal quotation marks omitted)).

The TEA-21 regulations include a number of provisions designed to minimize the burden on non-minority firms. For example, a firm owned by a non-minority can qualify as a DBE if the owner can demonstrate that he is socially and economically disadvantaged. 49 C.F.R. § 26.67(d). Moreover, the $750,000 net worth limitation on DBE status ensures that wealthy minorities who have not encountered discriminatory impediments do not receive an unwarranted windfall under the DBE program. *Id.* § 26.67(b).

5

**[8]** Overall, TEA-21 and its implementing regulations possess all the features of a narrowly tailored remedial program: Race-conscious remedies are used only when race-neutral means prove ineffective, these race-conscious measures are employed in a flexible manner and for a limited duration, and the program is tied to the labor market in each State and is designed to minimize the burden on non-minorities. *See Sherbrooke Turf, Inc.*, 345 F.3d at 972 (concluding that "the DOT regulations, on their face, satisfy the Supreme Court's narrow tailoring requirements"); *Adarand VII*, 228 F.3d at 1187 (same).

**[9]** We are satisfied that TEA-21's DBE program is a narrowly tailored means of remedying the effects of race- and sex-based discrimination within the transportation contracting industry, and thus Western States' facial challenge must fail.

V

We next consider Western States' as-applied challenge to the State of Washington's implementation of TEA-21.

A

Western States argues that TEA-21 is unconstitutional as applied by Washington because there is no evidence of dis-

crimination within the State's transportation contracting industry. The State responds that it is not obligated to demonstrate that its application of TEA-21 independently satisfies strict scrutiny. The State instead argues that its DBE program is constitutional because it comports with the federal statute and regulations.[7]

The United States, which intervened solely to defend TEA-21's facial constitutionality, disagrees with Washington's effort to shelter its DBE program from as-applied scrutiny. Indeed, at various stages throughout this litigation—including during the district court and appellate oral arguments—the United States has unambiguously conceded that TEA-21's race-conscious measures can be constitutionally applied only in those States where the effects of discrimination are present. *See* Br. for the United States at 28 ("DOT's regulations . . . are designed to assist States in ensuring that race-conscious remedies are limited to *only* those jurisdictions where discrimination or its effects are a problem . . . ."); Dist. Ct. Oral Argument Tr. 11 ("With respect to the individual contract goals, our regulations give maximum discretion to the states to use those or not to use those, although . . . the use of race-conscious goals need [sic] to be based on evidence of discrimination or the effects of discrimination in the state that has to be remedied.").

The district court sided with Washington and held that a "state recipient of federal highway funds is not required to independently establish that its DBE program satisfied the strict scrutiny standard." Dist. Ct. Order 17. The district court accordingly rejected Western States' as-applied challenge because the Washington DBE program is consistent with the federal program's requirements.

---

[7]Western States does not dispute the fact that Washington's DBE program complies with the federal program's requirements.

As a threshold matter, we must therefore determine whether Washington's DBE program is even susceptible to an as-applied challenge.

1

The Eighth Circuit is the only other appellate court to have confronted an as-applied challenge to TEA-21.[8] *See Sherbrooke Turf, Inc.*, 345 F.3d at 970. The Eighth Circuit concluded that it was unnecessary for Minnesota and Nebraska to establish that their DBE programs were premised upon a compelling interest independent of Congress's nationwide remedial objective. *Id.* The court explained:

> Compelling government interest looks at a statute or government program on its face. When the program is federal, the inquiry is (at least usually) national in scope. If Congress or the federal agency acted for a proper purpose and with a strong basis in the evidence, the program has the requisite compelling government interest nationwide, even if the evidence did not come from or apply to every State or locale in the Nation.

*Id.*

Although the Eighth Circuit did not require Minnesota and Nebraska to identify an independent compelling interest for their DBE programs, the court did inquire into whether the States' implementation of TEA-21 was narrowly tailored to achieve Congress's remedial objective. *Id.* at 973. In so doing, the court considered whether discrimination had actually occurred in Minnesota and Nebraska because "to be narrowly tailored, a *national* program must be limited to those parts of

---

[8]The Tenth Circuit in *Adarand VII* did not consider TEA-21's constitutionality as applied by a specific State and did not address whether it would be appropriate to do so.

the country where its race-based measures are demonstrably needed. To the extent the federal government delegates this tailoring function, a State's implementation becomes critically relevant to a reviewing court's strict scrutiny." *Id.* at 971. Both Minnesota and Nebraska had hired outside consulting firms to conduct statistical analyses of the availability and capacity of DBEs in their local markets, and the Eighth Circuit relied upon those studies to hold that the States' DBE programs independently satisfied strict scrutiny's narrow tailoring requirement. *Id.* at 973-74.

2

[9] We agree with the Eighth Circuit that Washington need not demonstrate an independent compelling interest for its DBE program. When Congress enacted TEA-21, it identified a compelling nationwide interest in remedying discrimination in the transportation contracting industry. Even if such discrimination does not exist in Washington, the State's implementation of TEA-21 nevertheless rests upon the compelling nationwide interest identified by Congress.

[10] We also agree with the Eighth Circuit that it is necessary to undertake an as-applied inquiry into whether Washington's DBE program is narrowly tailored, and we therefore conclude that the district court erred when it upheld Washington's DBE program simply because the State complied with the federal program's requirements.[9] Whether Washington's

---

[9]The district court cited cases from the Sixth and Seventh Circuits to bolster its conclusion that Washington need not independently satisfy strict scrutiny. The Seventh Circuit's decision in *Milwaukee County Pavers Association v. Fiedler*, 922 F.2d 419 (7th Cir. 1991) (Posner, J.), does not support the district court's unwillingness to pursue an as-applied narrow tailoring inquiry. There, a group of contractors challenged Wisconsin's implementation of the affirmative action provisions of a predecessor statute to TEA-21. *Id.* at 421. The court refused to consider whether discrimination had actually taken place in Wisconsin because the contractors had conceded that the federal statute was constitutional both on its face

DBE program is narrowly tailored to further Congress's reme-
dial objective depends upon the presence or absence of dis-
crimination in the State's transportation contracting industry.
If no such discrimination is present in Washington, then the
State's DBE program does not serve a remedial purpose; it
instead provides an unconstitutional windfall to minority con-
tractors solely on the basis of their race or sex. As the United
States correctly observed in its brief and during oral argu-
ment, it cannot be said that TEA-21 is a narrowly tailored
remedial measure unless its application is limited to those
States in which the effects of discrimination are actually pres-

_____

and as applied. *Id.* at 423 ("[The contractors'] arguments, whatever merit
they have or lack as an original matter, are inconsistent with the contrac-
tors' decision not to challenge the validity of the federal statute or regula-
tions."); *see also id.* ("[The contractors] challenge the Act neither on its
face nor as applied."). Because constitutionality was not at issue, there was
no basis for the court to undertake an as-applied inquiry. Moreover,
although the only question before the court was whether Wisconsin's pro-
gram complied with the federal statute, the court nevertheless observed
that the statute's affirmative action provisions would be unconstitutional
if applied in a State with no history of discrimination against minorities.
*See id.* at 424 ("The contractors point out that the remedial objective
which persuaded the Supreme Court to uphold the set-aside program chal-
lenged in the *Fullilove* [*v. Klutznick*, 448 U.S. 448 (1980),] case may be
a fiction when it is applied to a liberal northern state with a relatively
small minority population, such as Wisconsin, that does not even attempt
to ascertain the existence of a legacy of discrimination . . . . But this is just
to argue that set-aside programs such as this, upheld on their face in *Ful-
lilove*, are, as administered, the practice of cynical racial or interest-group
politics. Maybe so. If so, the program violates the Constitution.").

In the other case cited by the district court, *Tennessee Asphalt Co. v.
Farris*, 942 F.2d 969, 970 (6th Cir. 1991), the plaintiff did raise an as-
applied constitutional challenge to a TEA-21 predecessor statute. Invoking
*Milwaukee County Pavers*, the Sixth Circuit held that a State that imple-
ments the affirmative action provisions of a federal transportation statute
need not establish discrimination within its own jurisdiction. *Id.* at 975. In
so doing, the Seventh Circuit misread *Milwaukee County Pavers* in the
same manner as did the district court. Both courts overlooked the fact that
the plaintiffs in *Milwaukee County Pavers* were not pursuing an as-applied
constitutional challenge.

ent. *See* Dist. Ct. Oral Argument Tr. 48 ("The state would have to have evidence of past or current effects of discrimination to use race-conscious goals.").

Moreover, even when discrimination is present within a State, a remedial program is only narrowly tailored if its application is limited to those minority groups that have actually suffered discrimination. In *Croson*, for example, one of the rationales upon which the Supreme Court relied to invalidate the city's quota system was the program's expansive definition of "[m]inority group members," which encompassed "[c]itizens of the United States who are Blacks, Spanish-speaking, Orientals, Indians, Eskimos, and Aleuts." 488 U.S. at 478 (second alteration in original). The Court admonished that the

> random inclusion of racial groups that, as a practical matter, may never have suffered from discrimination in the construction industry in Richmond suggests that perhaps the city's purpose was not in fact to remedy past discrimination.

> If a 30% set-aside was "narrowly tailored" to compensate black contractors for past discrimination, one may legitimately ask why they are forced to share this "remedial relief" with an Aleut citizen who moves to Richmond tomorrow?

*Id.* at 506; *see also Wygant*, 476 U.S. at 284 n.13 (plurality op. of Powell, J.) (the "definition of minority to include blacks, Orientals, American Indians, and persons of Spanish descent further illustrates the undifferentiated nature of the plan" (citation omitted)).

We have previously expressed similar concerns about the haphazard inclusion of minority groups in affirmative action programs ostensibly designed to remedy the effects of discrimination. In *Monterey Mechanical Co. v. Wilson*, 125 F.3d

at 704, we relied upon *Croson* to invalidate a California statute that required prime contractors on public projects to subcontract 15% of the work to minority-owned businesses and 5% to woman-owned businesses. The statute defined the term "minority" to include Blacks, Hispanics, Native Americans, Pacific-Asians, Asian-Indians, and over two-dozen subgroups. *Id.* at 714. We concluded that the statute was not narrowly tailored because it provided race-based preferences to "groups highly unlikely to have been discriminated against in the California construction industry." *Id.* The overly inclusive designation of benefitted minority groups was a "red flag[ ] signalling that the statute is not, as the Equal Protection Clause requires, narrowly tailored." *Id.*; *see also Builders Ass'n of Greater Chi. v. County of Cook*, 256 F.3d 642, 647 (7th Cir. 2001) (holding that an ordinance that established minimum levels of minority participation in county construction contracts was not narrowly tailored because it afforded preferences to a "laundry list" of minorities, not all of whom had suffered discrimination); *Associated Gen. Contractors of Ohio, Inc. v. Drabik*, 214 F.3d 730, 737 (6th Cir. 2000) (invalidating a state statute that set aside 5% of state construction contracts for "Blacks, American Indians, Hispanics, and Orientals" because "[b]y lumping together [these] groups, . . . the [program] may well provide preference where there has been no discrimination, and may not provide relief to groups where discrimination might have been proven"); *O'Donnell Constr. Co. v. District of Columbia*, 963 F.2d 420, 427 (D.C. Cir. 1992) ("the random inclusion of racial groups for which there is no evidence of past discrimination in the construction industry raises doubts about the remedial nature of [a minority set-aside] program" (internal quotation marks omitted)).

Accordingly, each of the principal minority groups benefitted by Washington's DBE program—Black Americans, Hispanic Americans, Native Americans, Asian-Pacific Americans, Subcontinent Asian Americans, and women—must have suffered discrimination within the State. If that is not the case, then the DBE program provides minorities who have not

encountered discriminatory barriers with an unconstitutional competitive advantage at the expense of both non-minorities and any minority groups that have actually been targeted for discrimination. *See Builders Ass'n of Greater Chi.*, 256 F.3d at 646 (a "state or local government that has discriminated just against blacks may not by way of remedy discriminate in favor of blacks *and* Asian-Americans *and* women" (emphases added)).

B

Washington's DBE program closely tracks the sample DBE program developed by the USDOT. In setting its DBE goal for the year 2000, the WSDOT first calculated the relative availability of ready, willing, and able DBEs in the State.[10] It did so by dividing the number of transportation contracting firms in the Washington State Office of Minority, Women and Disadvantaged Business Enterprises Directory by the total number of transportation contracting firms listed in the Census Bureau's Washington database. This calculation yielded a figure of 11.17%, which represented the baseline availability of DBEs.

The WSDOT then adjusted this figure to account for the proven capacity of DBEs to perform work, as reflected by the volume of work performed by DBEs on state projects between 1994 and 1998. The WSDOT determined that an upward adjustment was necessary to account for capacity because DBEs had performed approximately 18% of the work on state projects during that period. No adjustment was made, however, to account for discriminatory barriers in obtaining bonding and financing. The WSDOT explained that "[b]onding and financing have not been issues. WSDOT, through its DBE Support Services consultant, has been very

---

[10]Washington's 2000 DBE program is the only finalized, USDOT-approved plan included in the record and is thus the only annual program that is properly before us.

aggressive in assisting DBEs with bonding and financing mat-ters." WSDOT, *Disadvantaged Business Enterprise Program: Participation Plan*, at xviii-3 (2000). The WSDOT likewise did not make any adjustment to its base figure to reflect the effects of past or present discrimination because it lacked any statistical studies evidencing such discrimination. On the basis of the upward adjustment for capacity, the WSDOT arrived at a final DBE utilization goal of 14%.[11]

The WSDOT then sought to ascertain the proportion of this goal that could be achieved through race-neutral means. In making that determination, it relied upon the 9% DBE partici-pation rate on state-funded contracts that did not include affir-mative action components. The WSDOT accordingly reasoned that it would need to achieve 5% of its 14% DBE utilization goal through race-conscious means. The USDOT approved the WSDOT's goal-setting methodology and the totality of its 2000 DBE program.

## C

Washington has conceded that "there's [sic] no statistical studies done by the state to try to establish the existence of discrimination in the highway contracting industry that are completed or that are valid." Dist. Ct. Oral Argument Tr. 12. Washington nevertheless argues that it possesses evidence of discrimination because minority-owned firms had the capacity to perform 14% of the State's transportation contracting work in 2000 but received only 9% of the subcontracting funds on contracts that did not include affirmative action components.

The WSDOT arrived at that capacity figure by adjusting the percentage of ready, willing, and able DBEs in Washing-

---

[11]Although DBEs had performed 18% of work on state projects between 1994 and 1998, the State set the final capacity-adjusted figure at 14% because TEA-21 reduced the number of eligible DBEs in Washington by imposing more-stringent certification requirements.

ton (11.17%) to reflect the fact that DBEs had received approximately 18% of subcontracting funds between 1994 and 1998. This 18% figure was obtained, however, on contracts that included affirmative action components. *See* Dist. Ct. Oral Argument Tr. 20 ("I would venture to say that almost all of the subcontractor attainment [between 1994 and 1998] was race conscious because prior to TEA-21, we typically had 16 percent—our annual goal was always 16 percent, and that was often the contract goal. . . . [I]n fact, that was one of our problems when TEA-21 came around, the regulation had a whole new methodology for calculating and we were never certain what the proper level should be because we had always had goals in the past."). This number therefore does not reflect the performance capacity of DBEs in a race-neutral market. Indeed, the State acknowledged as much to the district court. *See id.* at 21 ("[W]e suspected that our past attainment was largely driven by the existence of goals on the contracts, and so it was very difficult to analyze what would be—what would have been the attainment absent those goals.").

The disparity between the proportion of DBE performance on contracts that include affirmative action components and on those without such provisions does not provide any evidence of discrimination against DBEs. Indeed, even in States in which there has never been discrimination, the proportion of work that DBEs receive on contracts that lack affirmative action requirements will be lower than the share that they obtain on contracts that include such measures because minority preferences afford DBEs a competitive advantage.

Accordingly, the only figure upon which Washington can plausibly rely to demonstrate discrimination is the disparity between the proportion of DBE firms in the State (11.17%) and the percentage of contracting funds awarded to DBEs on race-neutral contracts (9%). This oversimplified statistical evidence is entitled to little weight, however, because it does not account for factors that may affect the relative capacity of

DBEs to undertake contracting work. Indeed, the fact that DBEs constitute 11.17% of the Washington market does not establish that they are able to perform 11.17% of the work. *See Md. Troopers Ass'n v. Evans*, 993 F.2d 1072, 1077 (4th Cir. 1993) ("Inferring past discrimination from statistics alone assumes the most dubious of conclusions: that the true measure of racial equality is always to be found in numeric proportionality."). DBE firms may be smaller and less experienced than non-DBE firms (especially if they are new businesses started by recent immigrants) or they may be concentrated in certain geographic areas of the State, rendering them unavailable for a disproportionate amount of work. *See Coral Constr. Co. v. King County*, 941 F.2d 910, 919 (9th Cir. 1991) ("Statistical evidence often does not fully account for the complex factors and motivations guiding employment decisions, many of which may be entirely race-neutral."); *Associated Gen. Contractors of Ohio, Inc.*, 214 F.3d at 736 ("If [minority-owned firms] comprise 10% of the total number of contracting firms in the state, but only get 3% of the dollar value of certain contracts, that does not alone show discrimination, or even disparity. It does not account for the relative size of the firms, either in terms of their ability to do particular work or in terms of the number of tasks they have the resources to complete."); *O'Donnell Constr. Co.*, 963 F.2d at 426 (holding that the small proportion of D.C. public contracts awarded to minority-owned firms did not establish discrimination because "[m]inority firms may not have bid on . . . construction contracts because they were generally small companies incapable of taking on large projects; or they may have been fully occupied on other projects; or the District's contracts may not have been as lucrative as others available in the Washington metropolitan area; or they may not have had the expertise needed to perform the contracts; or they may have bid but were rejected because others came in with a lower price."). The State's statistical evidence controls for none of these factors.

Moreover, to the extent that this small disparity has any probative value, it is insufficient, standing alone, to establish

the existence of discrimination against DBEs. *See Croson*, 488 U.S. at 509 (plurality op. of O'Connor, J.) ("Where there is a *significant* statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors, an inference of discriminatory exclusion *could* arise." (emphases added)). *Compare Md. Troopers Ass'n*, 993 F.2d at 1078 & n.3 (holding that there was no statistical evidence of discrimination where blacks constituted 22% of the relevant qualified labor pool and 17.1% of the Maryland State Police force), *with Associated Gen. Contractors of Cal., Inc. v. Coalition for Econ. Equity*, 950 F.2d 1401, 1414 (9th Cir. 1991) (concluding that discrimination was likely to exist where minority availability for prime contracts was 49.5% but minority dollar participation was only 11.1%), *and Cone Corp. v. Hillsborough County*, 908 F.2d 908, 916 (11th Cir. 1990) (holding that a "glaring 10.78% disparity between the percentage of minority contractors in the County and the percentage of County construction dollars awarded to minorities . . . clearly constitutes a prima facie case of discrimination").

The WSDOT likewise did not introduce any anecdotal evidence of discrimination. In response to Western States' discovery request, the WSDOT identified only three formal complaints alleging discrimination in Washington transportation contracts. Two of these complaints had been investigated and rejected as meritless by the WSDOT; the third was still under investigation.

Perhaps recognizing the insufficiency of its evidentiary record, the State contended for the first time during oral argument before us that the affidavits signed by applicants seeking DBE status provide evidence of discrimination within Washington. *See* 49 C.F.R. § 26.67(a) ("You must require applicants to submit a signed, notarized certification that each presumptively disadvantaged owner is, in fact, socially and

economically disadvantaged."). This argument is unavailing for two reasons.

First, these affidavits are not included in the record and thus are not properly before us. *See United States v. Elias*, 921 F.2d 870, 874 (9th Cir. 1990) ("Documents or facts not presented to the district court are not part of the record on appeal."). Second, even if we were to consider these affidavits, they do not provide any evidence of discrimination within Washington's transportation contracting industry. Notwithstanding the State's express representation to the contrary during oral argument, these affidavits do *not* require prospective DBEs to certify that they have been victims of discrimination in the contracting industry. Rather, as mandated by the federal regulations, the owner of a firm applying for DBE status need only attest to having "been subjected to racial or ethnic prejudice or cultural bias, or hav[ing] suffered the effects of discrimination, because of [his] identity as a member of one or more [minority groups], without regard to [his] individual qualities." *See* Disadvantaged Business Enterprise Program Uniform Certification Application, at 19, *available at* http://www.omwbe.wa.gov/Application%20for%20 Website%20-%20Federal%20Program%20Only.pdf.

Such claims of general societal discrimination—and even generalized assertions about discrimination in an entire industry—cannot be used to justify race-conscious remedial measures. *See Croson*, 488 U.S. at 498 ("[A] generalized assertion that there has been past discrimination in an entire industry provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy. It has no logical stopping point. 'Relief' for such an ill-defined wrong could extend until the percentage of public contracts awarded to [minorities] . . . mirrored the percentage of minorities in the population as a whole." (internal quotation marks and citation omitted)); *Shaw v. Hunt*, 517 U.S. 899, 909-10 (1996) ("an effort to alleviate the effects of societal discrimination is not a compelling interest"); *Wygant*, 476 U.S. at 276

(plurality op. of Powell, J.) ("Societal discrimination, without more, is too amorphous a basis for imposing a racially classified remedy.").

**[12]** The record is therefore devoid of any evidence suggesting that minorities currently suffer—or have ever suffered—discrimination in the Washington transportation contracting industry. We must therefore conclude that Washington's application of TEA-21 conflicts with the guarantees of equal protection because the State's DBE program is not narrowly tailored to further Congress's remedial objective. The "exact connection" between means and ends that is a prerequisite to the use of racial classifications is demonstrably absent from Washington's DBE program. *Gratz*, 539 U.S. at 270 (internal quotation marks omitted).[12]

VI

Western States' facial challenge fails because Congress identified a compelling remedial interest when it enacted TEA-21 and the DBE program established by the USDOT's regulations is—on its face—a narrowly tailored means of achieving that objective. We therefore affirm summary judgment in favor of the United States, the USDOT, and the Federal Highway Administration.

**[13]** The State of Washington, however, has not proffered any evidence of discrimination within its own contracting market and has thus failed to meet its burden of demonstrating that its DBE program is narrowly tailored to further Congress's compelling remedial interest. We therefore reverse the district court's grant of summary judgment as to the WSDOT, the City of Vancouver, and Clark County, and remand this

---

[12]The State's failure to present evidence of discrimination against *any* minority group alleviates the need for us to undertake a separate inquiry into whether the Washington DBE program's definition of presumptively disadvantaged groups is overbroad.

matter to the district court with instructions to enter summary judgment in favor of Western States on its as-applied challenge.[13] *See Dewitt Constr. Inc. v. Charter Oak Fire Ins. Co.*, 307 F.3d 1127, 1135 n.6 (9th Cir. 2002) (directing the district court on remand to grant partial summary judgment where there were no disputed issues of material fact).

**AFFIRMED** in part, **REVERSED** in part, and **REMANDED** for further proceedings consistent with this opinion.[14]

---

McKAY, Circuit Judge, concurring in part dissenting in part:

I agree with the majority's discussion of the facial constitutionality of TEA-21. However, as to its "as-applied" discussion, the majority opinion splits the circuits without persuasive support for its position. I am persuaded by the position taken by both the Sixth and Seventh Circuits, and therefore dissent in part.

The flaw that I see in the majority's opinion is its improper reliance on cases that are inapposite. Cases like *Monterey*

---

[13]The city and county argue that they are entitled to summary judgment on Western States' damages claims because there is no evidence that they engaged in intentional racial discrimination. The district court did not reach this issue and instead dismissed the damages claims because they "hinge upon the assertion that TEA-21 is unconstitutional." Dist. Ct. Order 18. Although this Court "may affirm summary judgment on an alternative ground to that given by the district court if the record fairly supports the alternative ground," *Gulf USA Corp. v. Fed. Ins. Co.*, 259 F.3d 1049, 1060 n.13 (9th Cir. 2001), we need not decide whether it would be appropriate to do so here. It will be necessary on remand for the district court to address the State's liability for damages, and thus we also remand Western States' damages claims against the city and county to allow the district court to resolve all aspects of this issue in the first instance.

[14]Each party shall bear its own costs on appeal. *See* Fed. R. App. P. 39(a)(4).

*Mechanical Co.*, *Builders Ass'n of Greater Chicago*, *Drabik*, *O'Donnell Construction Co.*, and *Croson* concern the constitutionality of state, municipal or county race-based remedial statutes or ordinances. The statute at issue in this appeal is a national, congressionally mandated statute. The importance of this distinction was appropriately noted in *Tennessee Asphalt Co. v. Farris:*

> [T]he joint lesson of *Fullilove* and *Croson* [is] that the federal government can, by virtue of the enforcement clause of the Fourteenth Amendment, engage in affirmative action with a freer hand than states and municipalities can do. And one way it can do that is by authorizing states to do things that they could not do without federal authorization.

*Farris*, 942 F.2d 969, 975 (6th Cir. 1991) (quoting *Milwaukee County Pavers Ass'n v. Fiedler*, 922 F.2d 419, 423-24 (7th Cir. 1991)) (internal quotations omitted).

The majority discounts the importance of *Farris* because of its reliance on *Milwaukee County Pavers*. Maj. Op. at 5027-28 n.9. The majority opines that it is improper to rely on *Milwaukee County Pavers* because it did not involve an "as-applied" challenge. *Id.* I respectfully disagree.

Reading *Milwaukee County Pavers* as not discussing an as-applied challenge focuses too much on the opinion's form instead of on its substance. This error is likely due to a slip of the authoring judge's pen. The court, after stating that the plaintiffs did not "challenge the Act . . . on its face [or] as applied[,]" phrased the plaintiffs' argument as whether Supreme Court precedent demonstrates that "the set-aside program, *as implemented in Wisconsin*, is necessary to rectify invidious discrimination." *Milwaukee County Pavers*, 922 F.2d at 423 (emphasis added). Whether the parties, or the court for that matter, use "proper" phraseology in articulating their arguments is, to me, irrelevant. Recognizing the apparent

conflict of words in the opinion, I am forced to rely on the opinion's substance.

The clear substance of the opinion in *Milwaukee County Pavers* concerns an as-applied challenge to a congressional enactment sought to remedy past discrimination. The plaintiffs did not "challenge the validity of the federal statute or regulations" because their only concern was how the presumptively valid federal statutory and regulatory laws were being implemented (or applied) by the state of Wisconsin. *Id.* The plaintiffs' argument in *Milwaukee County Pavers*, quoted below, is strikingly similar to the argument presented in this case.

> The [plaintiffs] point out that the remedial objective . . . may be a fiction when it is applied to a liberal northern state with a relatively small minority population . . . that does not even attempt to ascertain the existence of a legacy of discrimination that might justify favored treatment for highway construction firms owned by blacks, or Hispanics, or American Indians, or Asians, or women.

*Id.* at 424. I see no difference between that argument and the one presented by Plaintiffs in our case. I also agree with the reasoning articulated in *Milwaukee County Pavers* that only when the state exceeds its federal authority is it susceptible to an as-applied constitutional challenge. *Id.* at 423-24.

In addition, the case relied upon by the majority to support their contention that an as-applied challenge is required supports my conclusion. In *Sherbrooke Turf, Inc. v. Minnesota Department of Transportation*, 345 F.3d 964, 968 (8th Cir. 2003), the Eighth Circuit analyzed the affirmative action "program as implemented"[1] by Minnesota and Nebraska. In

---

[1] I find it ironic that the actual language used in *Sherbrooke*, "as implemented," is the same as that used in *Milwaukee County Pavers*, despite the majority's contention that they stand for different propositions.

performing that analysis, the Eighth Circuit was concerned with whether the individual state followed the appropriate regulations, *not* with whether there was sufficient information to establish past discrimination within the state. *See Sherbrooke Turf*, 345 F.3d at 973 (explaining that MnDOT and NDOR each commissioned an independent expert to ensure compliance with 49 C.F.R. § 26.45(c)).

It cannot be legitimately disputed that Defendants have complied with TEA-21 and its implementing regulations. If the Plaintiffs are concerned that certain "minorities" are being "provide[d] an unconstitutional windfall . . . solely on the basis of their race or sex," Maj. Op. at 5028, then they should follow the procedure outlined in the Code of Federal Regulations and attempt to rebut the presumption of disadvantage, not file a federal lawsuit. *See* 49 C.F.R. § 26.67(b).

I respectfully dissent.