In the

# United States Court of Appeals

## For the Seventh Circuit

No. 05-3981

NORTHERN CONTRACTING, INC.,

*Plaintiff-Appellant*,

*v.*

STATE OF ILLINOIS, ILLINOIS
DEPARTMENT OF TRANSPORTATION,
KIRK BROWN, in his capacity as the
Illinois Secretary of Transportation, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 4515—**Rebecca R. Pallmeyer**, *Judge*.

ARGUED APRIL 13, 2006—DECIDED JANUARY 8, 2007

Before COFFEY, KANNE, and WILLIAMS, *Circuit Judges*.

WILLIAMS, *Circuit Judge*. The question in this case is whether the Illinois Department of Transportation violated the United States Constitution in administering a program designed to increase the participation of socially and economically disadvantaged individuals in Illinois highway construction subcontracting. After a trial, the district court concluded that the plaintiff had failed to prove a constitutional violation. Plaintiff Northern Contracting, Inc. now appeals, arguing that the State's

disadvantaged business enterprise program is not narrowly tailored to further a compelling governmental interest. For the reasons that follow, we affirm the judgment of the district court.

## I.  BACKGROUND

Northern Contracting, Inc. ("NCI") is a corporation that specializes in the construction of guardrails and fences for highway construction projects in Illinois. Generally, Illinois highway construction projects are awarded to a prime contractor on the basis of the lowest qualified bid, and then the prime contractor completes the project through the use of subcontractors who perform work such as the guardrails work that is the specialty of NCI. Most of NCI's revenue comes through successful bids as a subcontractor in state and local highway projects.

In 2000, NCI filed this action seeking declaratory and injunctive relief against the State of Illinois, the Illinois Department of Transportation ("IDOT"), the United States Department of Transportation ("USDOT"), the Secretary of IDOT, and IDOT's Bureau Chief of the Bureau of Small Business Enterprises, under 42 U.S.C. §§ 1981, 1983, and 2000(d), claiming that IDOT's disadvantaged business enterprise ("DBE") program is unconstitutional. IDOT is the state agency responsible for construction and maintenance of all transportation infrastructure in Illinois, ranging from highways to airports. It receives approximately one third of its funding from the federal government.

IDOT's DBE program is an outgrowth of federal policy. Federal law establishes a national goal that ten percent of federal highway funds are to be spent with DBEs. *See* Surface Transportation Assistance Act of 1982, Pub. L. No. 97-424, § 105(f), 96 Stat. 2097, 2100 (1983); *see also*

Transportation Equity Act for the 21st Century ("TEA-21"), Pub. L. No. 105-178, § 1101(b)(1), 112 Stat. 107, 113 (1998). USDOT's implementing regulations for TEA-21 require all recipients of federal highway funds (such as IDOT) to have an approved DBE program. *See* 49 C.F.R. § 26.21(a).

To qualify as a DBE, a company must be at least 51% controlled by "individuals who are both socially and economically disadvantaged." *See* 49 C.F.R. § 26.5. "Socially disadvantaged individuals are those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities." 15 U.S.C. § 637(a)(5). "Economically disadvantaged individuals are those socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged." 15 U.S.C. § 637(a)(6)(A). A DBE owner's net worth cannot exceed $750,000. 49 C.F.R. § 26.67(a)(2)(i). The regulations require recipients to presume, rebuttably, that women and members of racial minority groups are socially and economically disadvantaged if an individual belonging to one of these groups attests to these qualifications in a signed and notarized document. *See* 49 C.F.R. § 26.67(a)(1). The regulations do not foreclose the classification to members of any racial group or gender. *See id.* A company with gross revenue exceeding $16.6 million cannot qualify as a DBE. *See* 49 C.F.R. § 26.65(b). NCI is not a DBE. It is not owned by women or members of any racial minority group.

A recipient of USDOT funds, such as IDOT, must take several steps in order to assure compliance with federal law pertaining to its required DBE program. First, the recipient must determine at the local level the figure that would constitute an appropriate DBE involvement goal,

based on the relative availability of DBEs. 49 C.F.R. § 26.45(b). The regulations detail the various methods a recipient may use to calculate DBE availability, but under any method selected, a recipient must begin by calculating a "base figure" for the relative availability of DBEs, and then must examine evidence in the local area to determine whether any adjustments to the base figure are needed. 49 C.F.R. §§ 26.45(c), 26.45(d). These adjustments lead to the final local goal. *See id.*

After a local goal is established, the recipient must submit its DBE plan to USDOT for approval, with explanations as to how it arrived at the goal. 49 C.F.R. § 26.45(f). USDOT is not allowed to withhold funds if a recipient later fails to meet its goal unless there is a demonstration of bad faith on the part of the recipient. 49 C.F.R. § 26.47(a).

At the implementation stage, a recipient is required to maximize the portion of its goal that can feasibly be achieved through race-neutral means. 49 C.F.R. § 26.51(a). The regulations provide a non-exhaustive list of race-neutral means through which a recipient can maximize DBE participation, including such steps as providing bonding assistance to all subcontractors, sponsoring informational programs, and ensuring the widest possible distribution of the recipient's DBE directory. *See* 49 C.F.R. § 26.51(b).

IDOT typically adopts a new DBE plan each year. In preparing the Fiscal Year 2005 plan, IDOT retained National Economic Research Associates, Inc. ("NERA"), a consulting firm, to conduct a "custom census" in order to determine DBE availability. The NERA custom census was ultimately conducted by Dr. Jon Wainwright, an economist. Wainwright's analysis involved first identifying the relevant geographic market (Illinois) and the relevant product market (transportation infrastructure

construction). Next, Wainwright surveyed Dun & Bradstreet's *Marketplace*, which is a comprehensive database of American businesses that identifies which businesses are minority or woman-owned. Wainwright supplemented this survey with IDOT's list of DBEs in Illinois. After arriving at this beginning list of DBEs, Wainwright corrected for errors in the data by surveying a random sample from the group; this survey led him to conclude that 22.8% of the firms listed as minority or woman-owned were actually owned by white men. He then surveyed all of the firms listed as not being minority or woman-owned; this survey led him to conclude that 14.5% were actually owned by minorities or women. In light of these two surveys, Wainwright adjusted his calculation of DBE availability and arrived at an overall relative availability of 22.77%. Wainwright then ran a regression analysis of Census Bureau data on earnings and business formation, and concluded that in the absence of discrimination, relative DBE availability would be 27.5%.

In arriving at its final goal for Fiscal Year 2005, along with the NERA report prepared by Wainwright, IDOT considered: (1) a study NERA conducted for Metra[1]; (2) expert reports used in *Builders Association of Greater Chicago v. Chicago*, 298 F. Supp. 2d 725 (N.D. Ill. 2003); (3) anecdotal information gathered at public hearings; (4) data on DBE involvement in construction projects in markets without DBE goals; and (5) IDOT's own data on the past use of DBEs. Included in IDOT's own data was a "zero goal" experiment conducted in 2002 and 2003, in which IDOT did not use DBE goals on 5% of its contracts.

---

[1] The Northeast Illinois Regional Commuter Railroad Corporation is commonly known as "Metra." It is a state-created entity that develops and administers public railway transportation in and around the city of Chicago.

On these contracts, DBEs ended up receiving approximately 1.5% of the total value of the contracts. Also of note, IDOT examined the system utilized by the Illinois State Toll Highway Authority, which does not receive federal funding; though the Tollway has a DBE goal of 15%, this goal is completely voluntary—the average DBE usage rate in 2002 and 2003 was 1.6%. On the basis of all of this data, IDOT adopted 22.77% as its Fiscal Year 2005 DBE goal.

Though 22.77% was IDOT's overall goal, it determines individually whether each project should carry a DBE goal, based on the type of project and the availability of DBEs to perform the subcontracting that will be necessary. After the prime contractor is selected (on the basis of the lowest qualified bid), the prime contractor has seven days to report its DBE utilization plan to IDOT. IDOT awards waivers and reductions of the goal if a contractor later demonstrates that it made a good-faith effort but was incapable of meeting the goal.

At the outset of this litigation, NCI's complaint alleged that (1) TEA-21 and USDOT's regulations were outside of the scope of Congressional power; (2) these federal provisions violated the Fifth Amendment's guarantee of equal protection; (3) the Illinois statute implementing the federal DBE requirement violated 42 U.S.C. §§ 1981, 1983, 2000(d) and the Fourteenth Amendment's Equal Protection Clause. NCI requested declaratary and injunctive relief.

After discovery closed in 2003, all of the parties to this suit filed cross-motions for summary judgment. The district court granted only USDOT's motion for summary judgment, concluding that the federal government had demonstrated a compelling interest (ending effects of current and past discrimination in highway contracting market) and that TEA-21 and its implementing regula-

tions were sufficiently narrowly tailored. The court concluded that a trial was necessary to determine whether IDOT's program was narrowly tailored.

At the bench trial, the State introduced the testimony of Wainwright, the testimony of owners of DBEs, and the testimony of an IDOT employee (Colette Holt) who explained the Fiscal Year 2005 DBE plan. NCI introduced the testimony of non-DBE prime contractors. The parties stipulated that: (1) the percentage of IDOT's total contracting expenditures that went to DBEs was 15.19% in 2003 and 18.05% in 2004; (2) the percentage of IDOT's contracting expenditures received by DBEs on contracts with DBE goals was 19% in 2003 and 17% in 2004; and (3) the percentage of contracting expenditures that went to DBEs on contracts with no DBE goals was 2% in 2003 and in 2004.

At the conclusion of the trial, Judge Pallmeyer found that IDOT's Fiscal Year 2005 DBE program was narrowly tailored to the compelling interest identified by the federal government—remedying the effects of racial and gender discrimination in the highway construction market—and granted judgment for the defendants. NCI now appeals from that judgment.[2]

## II. ANALYSIS

The only question that we must answer in this appeal is whether NCI can prove that IDOT's DBE program does not pass constitutional muster. Since the program involves racial classifications, we must employ strict scru-

---

[2] NCI did not appeal the grant of summary judgment for USDOT.

tiny in making this determination.[3] *See Adarand Constructors v. Pena*, 515 U.S. 200, 235 (1995). In order to survive strict scrutiny, a government program that uses racial classifications must be narrowly tailored to serve a compelling governmental interest. *See id.* Following a bench trial, we review the district court's legal conclusion that IDOT's program is constitutional de novo and its factual determinations for clear error. *Bricklayers Local 21 of Ill. Apprenticeship & Training Program v. Banner Restoration, Inc.*, 385 F.3d 761, 766 (7th Cir. 2004); *Riggins v. Walter*, 279 F.3d 422, 428 (7th Cir. 1995).

## A. Compelling Interest

NCI appears to have forfeited the argument that IDOT's DBE program does not serve a compelling governmental interest, focusing instead on the narrow tailoring prong of the test. Nevertheless, we think it prudent to briefly address the compelling interest aspect of the strict scrutiny analysis and we agree with the district court that

---

[3] As we have previously discussed, the Supreme Court has not made clear whether a more permissive standard applies to programs, such as this one, which also involve gender classifications, but IDOT does not argue for a more permissive standard for its gender-based initiatives and therefore we will apply strict scrutiny to the entire program. *See Builders Ass'n of Greater Chicago v. County of Cook*, 256 F.3d 642, 644-45 (7th Cir. 2001) ("Another unresolved issue is whether a different, and specifically a more permissive, standard is applicable to preferential treatment on the basis of sex rather than race or ethnicity . . . . But since here, as in *Milwaukee County Pavers*, the County doesn't argue for a different standard for the minority and women's set-aside programs, the women's program must clear the same four hurdles as the minority program.") (citing *Milwaukee County Pavers Ass'n v. Fiedler*, 922 F.2d 419, 422 (7th Cir. 1991)).

IDOT has satisfied its burden here. As a state entity implementing a congressionally mandated program, IDOT relies primarily on the federal government's compelling interest in remedying the effects of past discrimination in the national construction market.[4] In the post-*Adarand* era, two other circuits have considered the question of whether a state may properly rely on the federal government's compelling interest in implementing a local DBE plan for highway construction contracting, and both have concluded that a state may properly do so. *See Western States Paving Co., Inc. v. Washington State Dep't of Transp.*, 407 F.3d 983, 997 (9th Cir. 2005) ("When Congress enacted TEA-21, it identified a compelling nationwide interest in remedying discrimination in the transportation contracting industry. Even if such discrimination does not exist in Washington, the State's implementation of TEA-21 nevertheless rests upon the compelling interest identified by Congress."), *cert. denied*, 126 S. Ct. 1332 (Feb. 21, 2006); *Sherbrooke Turf, Inc. v. Minn. Dep't of Trans.*, 345 F.3d 964, 970 (8th Cir. 2003) ("When the program is federal, the inquiry is (at least usually) national in scope. If Congress or the federal agency acted for a proper purpose and with a strong basis in the evidence, the program has the requisite compelling government interest nationwide, even if the evidence did not come from or apply to every State or locale in the Nation."), *cert. denied*, 541 U.S. 1041 (2004).

As we noted above, NCI has not articulated any reason for us to break ranks with our sister circuits. Indeed, prior to the Supreme Court's decision in *Adarand*, we

---

[4] IDOT also argues that it has independently demonstrated that it has a compelling interest in "not passively channeling federal dollars into an industry still suffering the ill effects of discrimination." We need not determine in this case whether this independent interest can survive constitutional scrutiny.

considered the question of whether the federal government's interest in remedying discrimination in highway construction contracting provided sufficient justification for the state to engage in a federally mandated DBE program, and we concluded that it did. *See Milwaukee County Pavers Ass'n v. Fielder*, 922 F.2d 419, 423 (7th Cir. 1991) ("Insofar as the state is merely complying with federal law it is acting as the agent of the federal government and is no more subject to being enjoined on equal protection grounds than the federal civil servants who drafted the regulations . . . . If the state does exactly what the statute expects it to do, and the statute is conceded for purposes of the litigation to be constitutional, we do not see how the state can be thought to have violated the Constitution."). As in *Milwaukee County Pavers*, NCI has not challenged the constitutionality of the applicable federal statutes and regulations on appeal. And as the more recent decisions of the Eighth and Ninth Circuits make clear, our compelling interest analysis in this context should not be altered by *Adarand*. Therefore, the question of compelling interest must be decided in favor of IDOT. The only question is whether IDOT's program is narrowly tailored to achieving this compelling interest.

## B.  Narrow Tailoring

We are convinced that IDOT has satisfied its burden of demonstrating that its program is narrowly tailored. Our holding in *Milwaukee County Pavers* that a state is insulated from this sort of constitutional attack, absent a showing that the state exceeded its federal authority, remains applicable. *See Milwaukee County Pavers*, 922 F.2d at 424-25; *Tennessee Asphalt Co. v. Farris,* 942 F.2d 969, 975 (6th Cir. 1991) (citing *Milwaukee County Pavers* for the same point); *see also Western States Paving*, 407

F.3d at 1003-04 (McKay, J., concurring in part and dissenting in part) (noting the continuing applicability of *Milwaukee County Pavers* and concluding that the plaintiffs should be limited to challenging the state's adherence to its grant of federal authority).[5] In *Adarand*, the Supreme Court did not seize the opportunity to conclude that our decision in *Milwaukee County Pavers*, along with the Sixth Circuit's in *Tennessee Asphalt*, was incorrect. The Court only decided that federal programs involving racial classifications must also be subjected to strict scrutiny. *See Adarand,* 515 U.S. at 235. It did not invalidate our conclusion that a challenge to a state's application of a federally mandated program must be limited to the question of whether the state exceeded its authority. Here, because NCI has not challenged on appeal the district court's grant of summary judgment for the federal government, it has forfeited the opportunity to challenge the federal regulations.

---

[5] The Ninth Circuit in *Western States Paving* concluded that a state is still susceptible to an as-applied challenge to the narrow tailoring of its DBE program. *See Western States Paving*, 407 F.3d at 997-98. The court concluded that our decision in *Milwaukee County Pavers* did not address the situation of an as-applied challenged to such a program. *See id.* at 998 n.9. But as Judge McKay's separate opinion correctly observed, the majority in *Western States Paving* misread our decision in *Milwaukee County Pavers. See id.* at 1003-04. Relatedly, the Eighth Circuit, in *Sherbrooke,* concluded that this portion of our decision in *Milwaukee Pavers* was compromised by the fact that the challenge in our prior decision occurred "[u]nder the prior law—when the ten percent federal set-aside was more mandatory." *Sherbrook*e, 345 F.3d at 970. We are unconvinced by this reasoning—all recipients are still required to have compliant DBE programs in order to be eligible for federal transportation funds, however federal law makes more clear now that compliance could be achieved even with no DBE utilization if that were the result of a good faith use of the process.

We note that much of NCI's argument regarding narrow tailoring is based on our decision in *Builders Association of Greater Chicago v. County of Cook*,[6] but this reliance is misplaced. Even before *Adarand* expanded the applicability of strict scrutiny to federal programs, state and local governments that independently created affirmative action programs were subject to strict scrutiny, and we observed in *Builders Association* that the State was required to demonstrate that its program was narrowly tailored to remedy the specific past discrimination perpetrated by the State. *See Builders Ass'n*, 256 F.3d at 646. But as discussed above, IDOT here is acting as an instrument of federal policy and NCI cannot collaterally attack the federal regulations through a challenge to IDOT's program. *See Milwaukee County Pavers*, 922 F.2d at 424 ("Insofar as the state is merely doing what the statute and regulations envisage and permit, the attack on the state is an impermissible collateral attack on the statute and regulations."); *see also Kelley v. Bd. of Trs.*, 35 F.3d 265, 272 (7th Cir. 1994) (citing *Milwaukee County Pavers* and concluding that plaintiffs' attempted challenge to University's attempt to comply with requirements of Title IX was impermissible "collateral attack on the statute").

Thus, the remainder of our inquiry is limited to the question of whether IDOT exceeded its grant of authority under federal law. NCI presses three arguments in this respect. First, NCI argues that IDOT violated 49 C.F.R. § 26.45(c) by improperly calculating the relative availability of DBEs in Illinois. Second, NCI argues that IDOT failed to properly adjust its base figure based on local market conditions. Third, NCI argues that IDOT violated 49 C.F.R. § 26.51 by failing to meet the maximum feasible portion of its overall goal through race-neutral means. All three of NCI's arguments fail.

---

[6]   256 F.3d 642 (7th Cir. 2001).

49 C.F.R. § 26.45(c) describes the appropriate method for a recipient's calculation of the local base figure—the first step in the goal-setting process. The regulation gives several examples of appropriate methodology, but states explicitly in the paragraph preceding the list that: "[t]hese examples are not intended as an exhaustive list. Other methods or combinations of methods to determine a base figure may be used, subject to approval by the concerned operating administration." *Id.* Indeed, the fifth item in the list is entitled "Alternative Methods" and states: "You may use other methods to determine a base figure for your overall goal. Any methodology you choose must be based on demonstrable evidence of local market conditions and be designed to ultimately attain a goal that is rationally related to the relative availability of DBEs in your market." 49 C.F.R. § 26.45(c)(5). The other four methods in the list are (1) "Use DBE Directories and Census Bureau Data"; (2) "Use a bidders list"; (3) "Use data from a disparity study"; and (4) "Use the goal of another DOT recipient." 49 C.F.R. § 26.45(c)(1)-(4). The regulations provide detailed descriptions of each of these four examples that are not relevant here.

The regulations make clear that "relative availability" means "the availability of ready, willing and able DBEs relative to all businesses ready, willing and able to participate on your DOT-assisted contracts." 49 C.F.R. § 26.45(b). The gravamen of NCI's first noncompliance argument is that IDOT miscalculated the number of DBEs that were "ready, willing, and able" by utilizing the NERA custom census instead of a simple count of the number of registered and prequalified DBEs under Illinois Law. But as the district court correctly observed, NCI has pointed to nothing in the federal regulations indicating that a recipient must so narrowly define the scope of ready, willing, and available firms. The NERA custom census reflects an attempt by IDOT to arrive at more

accurate numbers than would be possible through use of just the list. Indeed, the method used here by NERA is the very methodology that was used by the Minnesota Department of Transportation in the unsuccessful challenge to its program in *Sherbrooke*. *See Sherbrooke*, 345 F.3d at 973. We agree with the district court that the remedial nature of the federal scheme militates in favor of a method of DBE availability calculation that casts a broader net. This conclusion is bolstered by guidance offered by USDOT on its website, where it suggests that recipients might supplement their DBE directories, for goal-setting purposes, with list of parties "attending [DBE certification] outreach sessions." *See Tips for Goal-Setting in the Disadvantaged Business Enterprise (DBE) Program*, available at http://osdbu.dot.gov/?TabId=133. Moreover, it seems illogical that the regulations would refer to five different methods of calculating the relative availability of DBEs if any method other than strict reference to the list of registered and prequalified DBEs would be considered inappropriate.[7] We are unpersuaded that NCI has demonstrated any noncompliance with 49 C.F.R. § 26.45(b).

NCI's second objection, that IDOT failed to properly adjust its goal based on local market conditions, also fails. As IDOT correctly responds in its brief, 49 C.F.R. § 26.45(d) does not require any adjustments to the base figure after the initial calculation, but simply provides recipients with authority to make such adjustments if necessary. NCI's argument is that IDOT essentially abused its discretion under this regulation by failing to separate prime contractor availability from subcon-

---

[7] The method that NCI argues for here is essentially the "bidders list" method that the regulations list as one possible method of calculating relative availability. *See* 49 C.F.R. § 26.45(c)(2).

tractor availability. However, NCI has not identified any aspect of the regulations that requires such separation. Indeed, as the district court observed, the regulations require the local goal to be focused on overall DBE participation in the recipient's DOT-assisted contracts. *See* 49 C.F.R. § 26.45(a)(1). It would make little sense to separate prime contractor and subcontractor availability as suggested by NCI when DBEs will also compete for prime contracts and any success will be reflected in the recipient's calculation of success in meeting the overall goal.

Finally, we find meritless NCI's argument that IDOT violated 49 C.F.R. § 26.51 by failing to meet the maximum feasible portion of its overall goal through race-neutral means of facilitating DBE participation. Under 49 C.F.R. § 26.51:

> Race-neutral DBE participation includes any time a DBE wins a prime contract through customary competitive procurement procedures, is awarded a subcontract on a prime contract that does not carry a DBE goal, or even if there is a DBE goal, wins a subcontract from a prime contractor that did not consider its DBE status in making the award (e.g., a prime contractor that uses a strict low bid system to award subcontracts).

NCI argues that IDOT's calculation of past levels of race-neutral DBE participation erred by failing to include a calculation of the instances when DBEs winning subcontracts from prime contractors on goal projects where the prime contractor did not consider DBE status. IDOT calculated the level of past race-neutral DBE participation by assessing the rate of DBEs winning contracts on no-goal projects. Though the regulations indicate that where DBEs win subcontracts on goal projects strictly through low bid this can be counted as race-neutral participation, NCI points to no aspect of the regulations

requiring IDOT to engage in a search for this information for the purpose of calculating past levels of race-neutral DBE participation. As IDOT explains, this evidence was not before it at the time that the Fiscal Year 2005 plan was adopted and NCI has not produced any evidence proving that IDOT's past participation figure is invalid. NCI accurately points out that, under 49 C.F.R. § 26.51(f)(1), IDOT was required to implement its program without setting contract goals if, under IDOT's approved projection, it estimated that it was able to meet its goal strictly through race-neutral means. But IDOT's projection yielded no such conclusion.

In any case, the record makes clear that IDOT uses nearly all of the methods described in § 26.51(b) to maximize the portion of the goal that will be achieved through race-neutral means. Among other methods, IDOT has sponsored different types of informational sessions, provided technical and financial training to DBEs and other small businesses, and has initiated a bonding and financing assistance program. NCI has failed to demonstrated that IDOT has not maximized the portion of its goal that will be met through race-neutral means. This failure reflects NCI's broader inability to demonstrate that IDOT's DBE program is in violation of the Constitution.

## III.  CONCLUSION

The judgment of the district court is AFFIRMED.

No. 05-3981 17

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*