GEOD CORPORATION, Christopher Emilius, John F. Emilius, Paul J. Emilius, Jr., and Stanley Palinski, Plaintiffs,

v.

NEW JERSEY TRANSIT CORPORATION, et al., Defendants.

Civil Action No. 04–2425 (SDW).

United States District Court, D. New Jersey.

Aug. 20, 2009.

278

Robert D. Rosen, Rosen & Avigliano, Esqs., Randolph, NJ, for Plaintiffs.

Nonee Lee Wagner, Office of the NJ Attorney General, Trenton, NJ, for Defendants.

## OPINION

WIGENTON, District Judge.

Before this Court are both Defendants'[1] and Plaintiffs'[2] Motions for Summary Judgment pursuant to Fed.R.Civ.P. 56(c). This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, 2201, 2202, and 42 U.S.C. § 1981. Venue is proper pursuant to 28 U.S.C. §§ 1391(b), and 1392. The Motion is decided without oral argument pursuant to Fed.R.Civ.P. 78. For the following reasons, Plaintiffs' Motion is DENIED; Defendants' Motion is GRANTED in part and DENIED in part.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff, Geod Corporation ("Geod") is a New Jersey corporation, located at 18–24 Kanouse Road, Newfoundland, New Jersey. (Def. Ex. 1, ¶ 6). Geod is owned solely by Plaintiffs, Christopher Emilius (Principal), John F. Emilius (President and CEO), Paul J. Emilius, Jr. (Vice–President), and Stanley Palinski (Vice–President) who are all white males. (*Id.* at ¶¶ 9–12). Geod specializes in performing surveying, topographic mapping, and photogrammetry. (Deposition of John Emilius at 16–17). Geod does not qualify as a socially and economically disadvantaged business under NJT's Disadvantaged Business Enterprise ("DBE") program. (Def. Ex. 1, ¶¶ 9–12).

Defendant NJT is "a body corporate and politic with corporate succession," N.J.S.A. 27:25–4 *et seq.* and an instrumentality of the State of New Jersey "exercising public and essential governmental function[s] ... [which] shall be deemed and held to be an essential governmental function of the State." (Def. Ex. 2, ¶ 15). NJT is allocated within the New Jersey Department of Transportation ("NJDOT"), but it is independent of any supervision or control by the NJDOT. (Def. Ex 2, ¶ 16). NJT is governed by a board of directors (the "Board") which consists of seven members: Defendants Jack Lettiere, Chairman of NJT's Board; Myron P. Shevell, vice-chairman of NJT's Board; Flora Castillo, a Governor appointee; Paul T. Fader, a Governor appointee; John L. McGoldrick, Governor appointee; Patrick W. Parkinson, a Governor appointee; and John E. McCormac, Treasurer of the State of New Jersey. (Def. Ex 1, ¶ 20)

Defendant James E. McGreevey was the Governor of the State of New Jersey; he did not sit on NJT's Board. (*Id.*) Defendant George D. Warrington was the Executive Director of NJT; he is now deceased. (*Id.*) Defendant Jan Walden is the Director of Certification and Special Projects, Office of Business Opportunity, for NJT. (*Id.*)

NJT receives federal funds from the U.S. Department of Transportation ("USDOT"). NJT implemented a DBE program pursuant to the Transportation Equity Act for the 21st Century (TEA–21), Pub.L. 105–178, 112 stat. 107 (1998) and C.F.R. Part 26, §§ 26.1 *et. seq.* NJT's DBE program requires bidders on NJT construction contracts to submit: (i) the amount of contract dollars to be subcontracted to DBEs; (ii) the DBEs' identity; and (iii) the type of work subcontracted to the DBEs. NJT's DBE program requires prime contractors to consider race, ethnici-

---

**1.** All Defendants: New Jersey Transit ("NJT"), Jack Lettiere, Myron P. Shevell, Flora M. Castillo, Paul T. Fader, John E. McCormac, John L. McGoldrick, James E. McGreevey, Patrick W. Parkinson, George D. Warrington, and Jan Walden, are collectively referred to as "Defendants".

**2.** All Plaintiffs: Geod Corporation, Christopher Emilius, John F. Emilius, Paul J. Emilius, Jr., and Stanley Palinsky are collectively referred to as Plaintiffs.

ty, and gender in selecting subcontractors and consultants.

NJT hired the University of Minnesota and Dr. Samuel Myers as its DBE consultant. (Def. Ex. 7). Dr. Myers performed a disparity study entitled "FINAL REPORT: An Availability, Utilization and Decomposition Analysis of New Jersey Transit's Disadvantage Business Enterprise Program" ("Disparity Study") for NJT in 2002, which concluded that actual discrimination occurred in NJT's prequalification and contracting processes generally attributable to passive discrimination. (Def. Ex. 12). The disparity study focused on five categories of "disadvantaged" groups: Blacks, Hispanics, Asians, Women, and "unknown". NJT's DBE goals are determined by utilizing a formula which accounts for each "disadvantaged" group. NJT also considers firms owned by individuals of Iraqi decent to be "socially disadvantaged". (NJT's Admission 12). NJT's DBE goals for the last seven years have been: 2002–28.0% DBE goal: 25.0% race conscious, 3% race neutral (NJT 00003628); 2003–25.0% DBE goal: 22.0% race conscious, 3.0% race neutral (NJT 00003667); 2004–19.0% DBE goal: 10.0% race conscious, 9.0% race neutral (NJT 00005915); 2005–25.0% DBE goal: 20.0% race conscious, 5.0% race neutral (NJT 0000004); 2006–17.38% DBE goal: 11.07% race conscious, 6.31% race neutral (NJT 00014253); 2007–19.9% DBE goal: 11.2% race conscious, 8.7% race neutral (N.Y.T FY07 DBE goals at 1); 2008–21.74% DBE goal: 10.22% race conscious, 11.52% race neutral (N.Y.T FY08 DBE goals). These goals were approved by the Federal Transit Authority ("FTA"). (Pl. Ex. 19). NJT has never applied for a waiver or exemption from DBE regulations. (NJT's Admission 27).

Generally, approximately $200,000 of the overall Business Diversity budget is designated for race neutral programs. These programs include outreach, small business activities, technical assistance programs, and universal advertising. (Def. Ex. 7, 41–47). NJT also sponsors conferences and workshops for small businesses in general. (*Id.* at 45). Types of workshops include how to do business with NJT, how to estimate, how to audit, how to get through an audit by NJT, and marketing your business. (*Id.* at 46).

NJT's contract goals are set on each project by a team that considers the availability of subcontracting opportunities, the nature of the geographic market, the available DBEs, and other contract specific characteristics. (Pl. Ex. 10). Once the DBE goal is set, NJT's procurement staff can request modifications before the bidding process begins. (*Id.*) Once a bid is received, the Business Diversity Office ensures contract compliance with the DBE Form A and eliminates bid shopping. (Pl. Ex. 8). No DBE goal is set for a particular subcontract whenever there are at least three DBEs available. (Dep. of Ellsworth Wiggins, July 6, 2005 at 30). A DBE can use its own workforce to meet the DBE goal on a NJT construction or engineering and design project. (Def. Ex. 6). When NJT sets a DBE goal on a particular project, meeting that goal is a factor in determining which firm is awarded that construction or engineering and design contract. (Def. Ex. 6).

On October 6, 2004, Plaintiffs filed an Amended Complaint against NJT, its Board members, select NJT employees, and the Governor of New Jersey, individually. Plaintiffs complaint seeks: (1) damages of $500,000 [3] for NJT's alleged violations of: (i) the Fifth and Fourteenth Amendments, (ii) 42 U.S.C. §§ 1983, 1981,

---

**3.** It is unclear whether Plaintiffs are seeking $500,000 for each claim or in total.

et seq., and (iii) the rights guaranteed them by Article 1, ¶¶ 1 and 5 of the Constitution of the State of New Jersey; (2) a declaration that NJT's DBE program is unconstitutional and in violation of Plaintiffs' civil rights pursuant to (i) 42 U.S.C. §§ 1981, 1983 et seq.; and (ii) Article 1, ¶¶ 1 and 5 of the Constitution of the State of New Jersey; (3) to permanently enjoin NJT from enforcing or utilizing the DBE program from violating Plaintiffs' constitutional rights pursuant to: (i) 42 U.S.C. §§ 1983 et seq., (ii) Title VI of the Civil Rights Act 1964, as amended, 42 U.S.C. section 2000d, et seq.; (iii) Article 1, ¶¶ 1 and 5 of the Constitution of the State of New Jersey, and (iv) the Fourteenth and Fifth Amendments; and (4) a violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:2–1 *et seq.* and 10:5–32 *et seq.*, which Plaintiffs allege to suffer damages, including pain and suffering, and emotional distress.

On January 14, 2005, Defendants filed a motion to dismiss. The Honorable Jose L. Linares, U.S.D.J., granted said motion in part, and denied it in part.

On October 7, 2008, Defendants filed a Motion for Summary Judgment alleging that: (i) the state officials are entitled to qualified immunity; (ii) the individual employees are not federal employees capable of violating the Fifth Amendment; (iii) Defendants are not persons pursuant to 42 U.S.C. § 1983; and (iv) NJT's federally approved DBE program is constitutional.

On January 27, 2009, Plaintiffs filed a Motion for Summary Judgment alleging that NJT's DBE program is unconstitutional.

## SUMMARY JUDGMENT

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any materi-

al fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A factual dispute is genuine if a reasonable jury could return a verdict for the nonmovant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 318, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party meets the initial burden, the burden then shifts to the nonmovant who must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *Shields v. Zuccarini,* 254 F.3d 476, 481 (3d Cir.2001). The court may not weigh the evidence and determine the truth of the matter but rather determine whether there is a genuine issue as to a material fact. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. In doing so, the court must construe the facts and inferences in the light most favorable to the nonmoving party. *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 520, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991).

## DISCUSSION

Plaintiffs challenge the constitutionality of NJT's DBE program for eight reasons: (1) NJT cannot justify establishment of a program using race and sex based preferences; (2) NJT's Disparity Study does not provide a sufficient factual predicate to justify NJT's DBE program; (3) NJT's statistical evidence does not establish discrimination; (4) NJT does not have anecdotal data evidencing a "strong basis in evidence" of discrimination which justifies

a race and sex-based program; (5) NJT's Program is not narrowly tailored; (6) NJT's DBE program is over-inclusive; (7) NJT cannot show an exceedingly persuasive justification for gender preferences; and (8) NJT's racially discriminatory program is not narrowly tailored because race neutral alternatives exist.

In opposition, and on Motion for Summary Judgment, Defendants assert that its DBE program is narrowly tailored because it fully complies with the requirements of TEA–21.

## COMPELLING INTEREST

 States and their agencies are entitled to adopt the federal government's compelling interest in enacting the TEA–21 and its implementing regulations. *See Sherbrooke Turf, Inc. v. Minnesota Dept. of Transp.*, 345 F.3d 964, 970–971 (8th Cir.2003); *Gross Seed v. United States Department of Transportation*, 345 F.3d 964 (8th Cir.2003), cert. denied. 541 U.S. 1041, 124 S.Ct. 2158, 158 L.Ed.2d 729 (2004); *Northern Contracting, Inc. v. Illinois Dept. of Transportation.*, 473 F.3d 715 (7th Cir.2007) (affirming *Milwaukee County Pavers Ass'n v. Fiedler*, 922 F.2d 419 (7th Cir.), cert. denied, 500 U.S. 954, 111 S.Ct. 2261, 114 L.Ed.2d 714 (1991); *Western States Paving Company, Inc. v. Washington State Dept. Of Transportation*, 407 F.3d 983, 997 (9th Cir.2005), cert. denied, 546 U.S. 1170, 126 S.Ct. 1332, 164 L.Ed.2d 49 (2006)).

 Plaintiffs' argument that NJT cannot establish the need for its DBE program is a red herring, which is unsupported. Plaintiffs do not question the constitutionality or the compelling interest of the Federal DBE program. All states inherit the federal governments' compelling interest in establishing a DBE program; establishing such a program is not contingent upon a state agency demonstrating a need for same, as the federal government has already done so. *See Sherbrooke Turf,* 345 F.3d 964, 970–971 (8th Cir.2003) (holding that the state only needs to establish that its implementation of its DBE program is narrowly tailored because the compelling interest is in line with the federal government); *See also Western States Paving,* 407 F.3d 983 (9th Cir.2005) (holding that states only need to establish that their DBE program is narrowly tailored because the federal government has established that states have a compelling interest in implementing said program.) This reasoning also renders Plaintiffs' assertions that NJT's Disparity Study does not have sufficient factual predicate for establishing its DBE program, and that no exceedingly persuasive justification was found to support gender based preferences, without merit; NJT does not need to justify establishing its DBE program, as it has already been justified by the legislators.

## NJT's DBE Program, as applied

Both Plaintiffs' and Defendants' arguments are based on an alleged Circuit split. Plaintiffs rely on *Western States Paving Co., Inc. v. Washington State Department of Transportation, et al.,* 407 F.3d 983 (9th Cir.2005) for the proposition that an as-applied challenge to the constitutionality of a particular DBE program requires a demonstration by the recipient that the program is narrowly tailored. Conversely, Defendants rely primarily on *Northern Contracting Inc. v. State of Illinois, et al.,* 473 F.3d 715 (7th Cir.2007) for the proposition that if a DBE program complies with TEA–21, it is narrowly tailored. Although both parties assert a Circuit split, this Court views the various Circuits differing analyses as fact specific determinations which have lead to the parties distinguishing cases without any substantive difference in the application of

law. Each case actually makes considerably the same analysis under different facts. The Third Circuit however, has not addressed this issue.

■ The Ninth Circuit in *Western States Paving Co., Inc.*, 407 F.3d 983 (9th Cir.2005) held that in order for a DBE program to pass constitutional muster, it must be narrowly tailored; specifically, the recipient must evidence past discrimination in the relevant market in order to utilize race conscious DBE goals. In other words, the Ninth Circuit made a fact specific determination as to whether the DBE program complied with TEA–21 in order to decide if the program was narrowly tailored to meet the regulation's stringent requirements. The requirement that the recipient must evidence past discrimination is nothing more than a requirement of the regulation. In other words, the Court reviewed the evidence to ensure its compliance with TEA–21 before it decided the programs constitutionality, as applied.

■ The Seventh Circuit in *Northern Contracting, Inc. v. State of Illinois, et al.*, 473 F.3d 715 (7th Cir.2007) held that a recipient must demonstrate that its program is narrowly tailored, and that generally a recipient is insulated from this sort of constitutional attack absent a showing that the state exceeded its federal authority. *Id.* at 721. Thus, what is implicit in *Northern Contracting* is the fact that one may challenge the constitutionality of a DBE program, as it is applied, to the extent that said program exceeds its federal authority. Therefore, in accord with *Northern Contracting, Inc.*, and *Western States Paving Co., Inc.*, this court must determine first whether NJT's DBE program complies with TEA–21, then whether NJT exceeded its federal authority in its application of its DBE program. In other words, pursuant to *Northern Contracting*, the Court must determine whether the

DBE program complies with TEA–21 in order to determine whether the program, as implemented, is narrowly tailored.

The Eighth Circuit in *Sherbrooke*, found that Minnesota's DBE program was narrowly tailored because it was in compliance with TEA–21's requirements. Specifically, the Court found that a study was done to set a DBE goal; Minnesota then adjusted its DBE goal to reflect a race-neutral market and DBE availability; then based on the study predicted that it needed both a race neutral and a race conscious goal; next Minnesota required each prime contractor bidder to make good faith efforts to subcontract a prescribed portion of the project to DBEs. In other words, the Eight Circuit analyzed the application of Minnesota's DBE program to ensure compliance with TEA–21's requirements to ensure that the program was narrowly tailored.

■ TEA–21 delegates to each state that accepts federal transportation funds the responsibility of implementing a DBE program that comports with TEA–21. *See Western States Paving Co., Inc.*, 407 F.3d 983, 988 (9th Cir.2005). In order to comport with TEA–21 a recipient must (1) determine an appropriate DBE participation goal, (2) examine all evidence and evaluate whether an adjustment, if any, is needed to arrive at their goal, and (3) if the adjustment is based on continuing effects of past discrimination, provide demonstrable evidence that is logically and directly related to the effect for which the adjustment is sought. (*Id.*)

## I. Determination of DBE goal.

First a recipient must determine, at the local level, the figure that would constitute an appropriate DBE involvement goal, based on the relative availability of DBEs. 49 C.F.R. § 26.45(b); *Western States Pav-*

*ing Co., Inc.*, 407 F.3d at 989 (9th Cir. 2005).

49 C.F.R. § 26.45(b) states:

Your overall goal must be based on demonstrable evidence of the availability of ready, willing and able DBEs relative to all businesses ready, willing and able to participate on your DOT-assisted contracts (hereafter, the "relative availability of DBEs"). The goal must reflect your determination of the level of DBE participation you would expect absent the effects of discrimination. You cannot simply rely on either the 10% national goal, your previous overall goal or past DBE participation rates in your program without reference to the relative availability of DBEs in your market.

49 C.F.R. § 26.45(c) states that "[y]ou must begin your goal setting process by determining a base figure for the relative availability of DBEs." This section goes on to provide examples of how to determine the availability of DBEs. *Id.* However, although this section provides examples, the statute clearly states that "[t]hese examples are not intended as an exhaustive list. Other methods or combination of methods to determine a base figure may be used, subject to approval by the concerned operating administration." *Id.* The regulation suggests using: (1) DBE Directories and Census Bureau Data; (2) a bidders list; (3) data from a disparity study; (4) the goal of another DOT recipient; or (5) "[a]ny methodology ... based on demonstrable evidence of local market conditions and ... designed to ultimately attain a goal that is rationally related to the relative availability of DBEs in your market." 49 C.F.R. § 26.45(c).

■ Here, NJT did determine a base figure for the relative availability of DBEs,

which accounted for demonstrable evidence of local market conditions and designed to be rationally related to the relative availability of DBEs. NJT conducted a Disparity Study; the Disparity Study utilized NJT's DBE lists from fiscal years 1995–1999[4] and Census Data to determine its base DBE goal. (Pl. Ex. B12). Said Disparity Study took into account the primary industries, primary geographic market, and race neutral alternatives, then adjusted its goal to encompass these characteristics. (*Id.*) The use of DBE directories and census data are exactly what the legislature intended for state agencies to utilize in making a base DBE goal determination. *See* 49 C.F.R. § 26.45(c). Also, and perhaps more importantly, NJT's DBE goal was approved by the USDOT every year from 2002 until 2008. (*See* Pl. Exs. B1, B12–B17). Thus, NJT appropriately determined their DBE availability, which was approved by the USDOT, pursuant to 49 C.F.R. § 26.45(c). NJT has demonstrated that its overall DBE goal is based on demonstrable evidence of the availability of ready, willing, and able DBEs relative to all businesses ready, willing, and able to participate in DOT assisted contracts and reflects its determination of the level of DBE participation it would expect absent the effects of discrimination. Plaintiffs have not provided any evidence that NJT did not set a DBE goal based upon 49 C.F.R. § 26.45(c). Thus, genuine issues of material fact remain only as to whether a reasonable jury may find that the method used by NJT to determine its DBE goal was sufficiently narrowly tailored.

## II. NJT's Adjustment of its DBE Goal

49 C.F.R. § 26.45(d) states that "[o]nce you have calculated a base figure, you

---

**4.** Plaintiffs' argument that the data used in the Disparity Study is stale is a without merit and has no basis in law; therefore, this Court will not address same.

must examine all of the evidence available in your jurisdiction to determine what adjustment, if any, is needed to the base figure in order to arrive at your overall goal." The regulation goes on to state that there are many types of evidence that a recipient may evaluate including (i) the current capacity of DBEs to perform work in your DOT-assisted contracting program, as measured by the volume of work DBEs have performed in recent years; (ii) evidence from disparity studies conducted anywhere within your jurisdiction, to the extent it is not already accounted for in your base figure; and (iii) if your base figure is the goal of another recipient, you must adjust it for differences in your local market and your contracting program. *Id.*

■ Here, to determine what adjustment to make, the Disparity Study examined qualitative data such as: (i) focus groups on the pre-qualification status of DBEs, (ii) working with prime contractors, securing credit, and its effect on DBE participation, as well as (iii) procurement officer interviews to analyze, and compare and contrast their relationships with Non–DBE vendors and DBE vendors. (Defs. Ex. B12). This qualitative data was then compared to DBE bids and DBE goals for each year in question. (*Id.*) NJT's adjustment to its DBE goal also included an analysis of the overall disparity ratio, as well as, Black, American Indian, Hispanic, Women, Asian, and "unknown" utilization. (*Id.*) A decomposition analysis was also performed. (*Id.*) Thus, NJT has provided this Court with evidence that it, at a minimum, examined the current capacity of DBEs to perform work in its DOT assisted contracting program, as measured by the volume of work DBEs have performed in recent years, as well as utilizing the Disparity Study itself; two methods specifically approved by 49 C.F.R. § 26.45(d). Also, NJT took into account race neutral meas-

ures to ensure that the greatest percentage of DBE participation was achieved through race and gender neutral means. (*Id.* at 12). Critically, Plaintiffs have failed to provide evidence of another, more perfect, method that could have been utilized to adjust NJT's DBE goal. Simply stating that said adjustment is unwarranted is insufficient for a finding of summary judgment in Plaintiffs' favor. Thus, genuine issues of material fact remain only as to whether NJT's adjustment to its DBE goal is sufficiently narrowly tailored and thus constitutional.

### III. Effects of Past Discrimination

■ 49 C.F.R. § 26.45(a)(2)(d)(3) states that "[i]f you attempt to make an adjustment to your base figure to account for the continuing effects of past discrimination (often called the "but for" factor) or the effects of an ongoing DBE program, the adjustment must be based on demonstrable evidence that is logical and directly related to the effect for which the adjustment is sought."

In this case, NJT adjusted its DBE goal to account for the effects of past discrimination. The Disparity Study took into account the effects of past discrimination in the pre-qualification process of DBEs; specifically the Disparity Study states that:

> No matter which model specification is preferred or which comparison is used to determine the size of the discriminatory gain to non-DBEs or loss to DBEs, we uncover non-trival and statistically significant measures of discrimination in contract amounts awarded in the period from the mid–1990s to the beginning of the current decade.

(Def. Ex. B2, iv). However, what is gravely critical about said finding of the past effects of discrimination is that it only took into account six groups: (1) American In-

dian, (2) Hispanic, (3) Asian, (4) Blacks, (5) Women, and (6) "Unknown". Thus, this Court finds that the Disparity Report, although it takes into account the effects of past discrimination for five specifics groups, it does not include an analysis of past discrimination for the ethnic group "Iraqi" which is now a group considered to be a DBE by NJT. Because the Disparity Report does include a category entitled "unknown" a genuine issue of material fact remains as to whether "Iraqi" is legitimately within NJT's defined DBE groups and whether a demonstrable finding of discrimination exists for Iraqis. Thus, it is for a jury to decide whether factually, the "unknown" group encompasses Iraqis. Therefore, Plaintiffs' and Defendants' Motions for Summary Judgment, as to the constitutionality of NJT's DBE program, is denied.

**Qualified Immunity**

 State officials performing discretionary functions are generally immune from liability unless their conduct violates clearly established constitutional or statutory rights of which a reasonable person should have known. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The alleged victim must establish both (i) that the official's conduct violated a statutory or constitutional right and (ii) such right was clearly established at the time of the alleged misconduct. *See Pearson v. Callahan,* —— U.S. ——, 129 S.Ct. 808, 815–816, 818, 172 L.Ed.2d 565 (2009). A right is clearly established if it is "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

 Assuming *arguendo* that the individual Defendants' conduct violated a constitutional or statutory right, they are still entitled to qualified immunity because

such a right was not clearly established at the time of the alleged misconduct.

The Supreme Court in *Adarand Constructors v. Pena,* 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) held that the Surface Transportation and Uniform Relocation Assistance Act of 1987 ("STURAA") was unconstitutional because it was not narrowly tailored. *Adarand,* 515 U.S. 200 at 237–238, 115 S.Ct. 2097. Subsequently, Congress enacted TEA–21, to regulate race and gender conscious DBE programs. Similar to STURAA, the constitutionality of TEA–21 has been continuously challenged; the results of these challenges have amounted to what the parties in this litigation characterize as a split in Circuit jurisprudence. The Third Circuit has not spoken on this issue; both parties concede this point.

Here, what is clear, based on the parties' arguments, is that the law was not clearly established at the time NJT established its DBE program to comply with TEA–21. *Adarand* did not make TEA–21 a clearly established statute, in fact, it dealt with an entirely different federal regulation, STURAA. What *Adarand* accomplished was having Congress revisit affirmative action based programs within the USDOT and draft a statute which was narrowly tailored to achieve a compelling governmental issue. Now, the Courts are considering the application of TEA–21, the statute and regulation which resulted from *Adarand.* The parties concede that they interpret the various rulings in the several Circuit courts thus far to be inconsistent. The parties also acknowledge that the Third Circuit has not decided this issue. Thus, it is clear that the law was not clearly established at the time NJT established and implemented its DBE program. Therefore, Defendants are entitled to qualified immunity and their Motion for Summary Judgment as to same is granted.

**Title VI**

42 U.S.C. § 2000d states that "[n]o person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." *See also,* 49 C.F.R. § 26.7. Recipient is defined as "an entity, public or private, to which DOT financial assistance is extended, whether directly or through another recipient, through the program of the FAA, FHMA, or FTA, or who has applied for such assistance." 49 C.F.R. § 26.5.

 In this case, the individual defendants are not recipients of federal funds. The plain language of the statute defines recipient as "an entity, public or private ..." by definition, an individual human being cannot be deemed an "entity, public or private". Additionally, Plaintiffs have not provided any evidence that the actual persons who allegedly deprived Plaintiffs of their rights, specifically received funds from the federal government. These individuals operate the entity NJT; they did not personally receive funds, either directly or indirectly. Therefore, The individual Defendant's Motion for Summary Judgment is granted and Plaintiffs' Title VI claims are dismissed.

**NJT—Sovereign Immunity**

 Defendants assert that NJT is a state agency and thus, not a person pursuant to 42 U.S.C. § 1983. It is well established that a State cannot be held liable under Section 1983 both because it is not a "person" under the statute and because Eleventh amendment immunity bars the court from exercising jurisdiction over

such an action.[5] *Callahan v. City of Philadelphia,* 207 F.3d 668, 669 (3d Cir.2000). To determine whether an entity is a "person" under Section 1983 the Court must examine: (1) whether money to pay a judgment would be funded by the State; (2) the status of the agency under state law; and (3) whether the agency is autonomous from the State. *Fitchik v. New Jersey Transit Rail Operations, Inc.,* 873 F.2d 655, 659 (3d Cir.1989). All three factors should be balanced co-equally. *Callahan,* 207 F.3d at 670.

 First, the State of New Jersey provides operating and capital funds to NJT (*See NJ Transit Consol. Fin. Statements, FY2008* at 9, (Pls., Ex. "H" at 14)); however, "the fact that an entity derives some of its income from the state does not mean that it is entitled to partake of the state's immunity." *Fitchik,* 873 F.2d at 661. Of greater importance is whether the money paying a judgment would come from the State's treasury or from the agency's funds. *Id.* Considering that the Complaint requests $500,000 as Plaintiffs' damages (Compl. ¶ 108), NJT has the means to pay such a judgment from their existing funds, rather than going to the State for additional funding. Moreover, the State is under no obligation to pay NJT's debts or reimburse NJT for any judgments that it pays. N.J. Stat. § 27:25–17 (2009). However, it is not known whether Defendants will seek funds from the State of New Jersey to pay damages in the event Plaintiffs succeed on their claims.

Second, under state law NJT is a surrogate of the State of New Jersey. N.J.S.A. § 27:25–4 clearly states that NJT is "an

---

**5.** Although Plaintiffs assert Defendants are not entitled to 11th Amendment immunity, Defendants do not make such an argument. Rather Defendants argue that NJT is not a "person" under Section 1983. Therefore, the Court will not address Plaintiff's argument regarding 11th Amendment immunity.

288

instrumentality of the State." *Id.* Further, the New Jersey Supreme Court considers NJT to be a public entity under the Tort Claims Act. *Muhammad v. New Jersey Transit,* 176 N.J. 185, 821 A.2d 1148 (2003). Moreover, as stated *supra,* the State of New Jersey provides operating and capital funds to NJT.

Third, NJT does not have autonomy from the State of New Jersey. The Governor has veto power over all of the Board's decisions. N.J.S.A. § 27:25–4; N.J.S.A. § 27:25–5. Therefore, the Governor's veto power over the Board's actions prevents NJT from having autonomy from the State.

Thus, this Court finds after weighing all three factors that NJT is an extension of the State of New Jersey. It is possible, although unknown, that the State of New Jersey will pay NJT's damages if NJT is found liable to Plaintiffs. Also, it is clear that NJT is not autonomous from the State and NJT is clearly a surrogate of the State. In other words, NJT is not a "person" pursuant to 42 U.S.C. § 1983. Because NJT is not a "person" as defined by 42 U.S.C. § 1983 it cannot be held liable pursuant to 42 U.S.C. § 1983. Thus, Plaintiffs' claims based on a violation of Section 1983 are dismissed and NJT's Motion for Summary Judgment as to same is granted.

**Fifth Amendment**

 The Fifth Amendment provides that the federal government may not deprive a person of "life, liberty, or property." U.S. Const. Amen. V. Thus, "it is axiomatic that a plaintiff seeking relief pursuant to the Fifth Amendment must complain of federal government action." *Fischer v. Driscoll,* 546 F.Supp. 861 (1982); *see also, Bowman v. Pennsauken,* 709 F.Supp. 1329 (D.N.J.1989).

In the present case, no federal officials are alleged to have violated the Fifth Amendment. Hence, because no federal government action is alleged to have deprived Plaintiffs of any rights, Plaintiffs' Fifth Amendment claim is dismissed and Defendants' Motion for Summary Judgment as to same is granted.

**CONCLUSION**

For the reasons stated above, Plaintiffs' Summary Judgment motion is DENIED; Defendants' Summary Judgment motion is DENIED in part and GRANTED in part.